# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NAMA HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 7934-VCL |
| | ) | |
| RELATED WMC LLC, THE RELATED COMPANIES, L.P., and WMC VENTURE, LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 21, 2014
Date Decided: November 17, 2014

Stephen C. Norman, T. Brad Davey, Jordan A. Braunsberg, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiff NAMA Holdings, LLC.*

William M. Lafferty, Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Stacie E. Tobin, VENABLE LLP, Baltimore, Maryland; *Attorneys for Defendants Related WMC LLC, The Related Companies, L.P., and WMC Venture, LLC*

**LASTER, Vice Chancellor.**

In 2006, NAMA Holdings, LLC ("NAMA") gave notice to Related WMC LLC ("Related Sub") that NAMA had disputes with entities controlled by Shawn Samson and Jack Kashani. Related Sub had agreed to hold any funds in dispute while the competing claimants pursued arbitration. As a result, Related Sub came to hold approximately $11.8 million in a segregated account (the "Disputed Amounts").

In 2009, an arbitral panel (the "Panel") issued a decision that awarded NAMA over $13 million in damages and monetary sanctions against Samson and Kashani's entities (the "Arbitral Decision"). Under the custodial agreement, Related Sub could have released the Disputed Amounts upon receipt of the Arbitral Decision. Instead, Related Sub's sole member, The Related Companies, L.P. ("Related Parent"), caused Related Sub to continue holding the Disputed Amounts and then to release them to Samson as part of a *quid pro quo*.

At the time, Related Parent wanted access to funds in a different escrow account that Samson and Kashani controlled. Samson and Kashani had refused to let Related Parent access the funds unless Related Parent gave them a personal loan. Related Parent would not provide the loan because Samson and Kashani could not post collateral. Related Parent had evaluated whether Samson and Kashani could use their entities' share of the Disputed Amounts as collateral, but Related Parent concluded that after the Arbitral Decision, Samson and Kashani's entities would not receive any of the funds.

Related Parent, Samson, and Kashani then realized they could skip the intermediate step of a loan by orchestrating a release of the Disputed Amounts that would get a portion of the money into Samson and Kashani's pockets. In exchange for access to

1

the escrowed funds that Samson and Kashani controlled, Related Parent arranged with Samson to wire him the Disputed Amounts. Samson then immediately wired them out again, before NAMA knew anything was going on. Approximately $5.9 million ended up in accounts controlled by Samson, Kashani, or their affiliates. Although NAMA received its *pro rata* share of the Disputed Amounts, NAMA was prevented from using all of the funds to satisfy the damages awarded by the Arbitral Decision.

Believing that Related Sub had violated its custodial obligations, NAMA threatened to sue Related Sub for breach of contract and breach of the implied covenant of good faith and fair dealing. Related Sub and an affiliate, World Market Center Venture, LLC ("WMCV"), filed suit, seeking a declaration that they had complied with their contractual obligations. This court granted partial summary judgment in their favor, holding that they technically complied with the letter of the custodial contract. *World Mkt. Ctr. Venture, LLC v. NAMA Hldgs., LLC*, 2010 WL 1756876 (Del. Ch. Apr. 30, 2010) (the "Summary Judgment Opinion" or "SJ Op."). NAMA then brought claims against Related Parent, including a claim for tortious interference with contract. After some procedural developments, this court ruled that NAMA's claims against Related Sub for breach of the implied covenant of good faith and fair dealing and against Related Parent and WMCV for tortious interference with contract would proceed to trial.

This post-trial decision holds that Related Sub breached an implied term of the custodial contract that required Related Sub to act neutrally as to the Disputed Amounts. By holding the Disputed Amounts beyond the point when they could have been released, then arranging to release them into Samson's control, knowing that Samson and Kashani

2

intended to pocket a portion of the funds under circumstances where they otherwise would not see any of the money, Related Sub breached its implied obligation. By causing Related Sub to take these steps as part of a *quid pro quo* for its own benefit, Related Parent tortiously interfered with the custodial contract between Related Sub and NAMA. Related Parent and Related Sub are jointly and severally liable to NAMA in the amount of $5,894,391, plus pre- and post-judgment interest.

## I. FACTUAL BACKGROUND

Trial took place from May 6-8, 2014. The following facts were proven by a preponderance of the evidence.

### A. The World Market Center

In 1999, Samson and Kashani found commercial inspiration in a retail shopping mall dedicated to furniture and home furnishings located in High Point, North Carolina. Samson and Kashani envisioned the World Market Center (the "Center"), which would be an even larger mall dedicated to furniture and home furnishings located in Las Vegas, Nevada. They planned for the Center to consist of eight buildings to be constructed in eight phases, one phase for each building.

In 2000, Samson and Kashani began looking for investors. A business contact put Samson in touch with Nigel and Mousa Alliance (the "Alliance Brothers").

In 2001, Alliance Network, LLC was formed as the vehicle for owning, developing, and managing the Center. The members of Alliance Network were (i) Prime Associates Group, LLC ("Prime"), owned by Samson and Kashani, (ii) Crescent Nevada Associates, LLC ("Crescent"), owned by Kashani's relatives, and (iii) NAMA, owned by

the Alliance Brothers. Prime contributed 10% of the initial capital, Crescent contributed 20%, and NAMA contributed 70%.

The operating agreement for Alliance Network vested broad management authority in its sole manager, defined as Samson and Kashani jointly. NAMA received veto rights over certain actions (the "Veto Rights").

**B.      Disputes Lead To A Restructuring**

After purchasing the land for the Center, Alliance Network needed additional capital to begin Phase 1. NAMA would not fund the entire amount, and soon the Alliance Network members were embroiled in disputes.

In 2003, Samson identified Related Parent as a well-heeled financial backer. Headquartered in New York City, Related Parent is a privately held real estate firm engaged in the business of owning, developing, and operating real estate projects. Its extensive portfolio of properties includes apartment buildings, hotels, commercial developments, and exhibition facilities in the United States and abroad.

Related Parent was interested in the Center but concerned about the adversarial relationship between the Alliance Brothers and Samson and Kashani. Related Parent conditioned its participation on (i) the creation of a new entity that would insulate the Center from Alliance Network member disputes, (ii) Samson and Kashani serving as Alliance Network's sole authorized representatives for managing the Center, and (iii) NAMA giving up its Veto Rights.

A deal was struck. On the first issue, Alliance Network and Related Parent formed WMCV as the new entity for owning, developing, and managing the Center. WMCV had

two members: Network World Market Center, LLC ("Network") and Related Sub. Network was a wholly owned subsidiary of Alliance Network.[1] Related Sub was a wholly owned subsidiary of Related Parent. Through Related Sub, Related Parent obtained a one-third interest in Phase 1 and a 50% interest in all future phases of the Center.

On the second issue, the operating agreement for WMCV (the "WMCV Operating Agreement") provided that Samson and Kashani were the sole authorized representatives of Network. For day-to-day operating decisions, Related Sub could rely on either Samson or Kashani. For more significant matters, defined as "Major Decisions," Samson and Kashani had to act jointly.

On the third issue, NAMA agreed to give up its Veto Rights, but NAMA insisted on a mechanism for resolving future disputes over Alliance Network matters. Assisted by counsel, NAMA and Samson and Kashani negotiated Section 11 of the amended operating agreement for Alliance Network (the "Alliance Network Operating Agreement"), which required that the WMCV Operating Agreement contain a section that (i) gave any Alliance Network member the right to send Related Sub a notice identifying a dispute over the cash flows from the Center, and (ii) called for Related Sub to hold the disputed amounts in a segregated, interest-bearing account pending resolution of the dispute through arbitration. Section 11 of the Alliance Network Operating Agreement led to Section 12.18 of the WMCV Operating Agreement, which NAMA and

---

[1] Network was actually a wholly owned subsidiary of an intermediate entity, which in turn was a wholly owned subsidiary of Alliance Network. The intermediate entity is not relevant to this decision. For simplicity, it has been ignored.

its counsel helped draft. NAMA was made a third-party beneficiary of Section 12.18, which could not be amended without NAMA's prior written consent.

Section 12.18(g) of the WMCV Operating Agreement established the notice procedure and segregated-account mechanism. It stated:

> Upon receipt by Related [Sub] of a written notice from any member of Alliance Network (a "Disputing Alliance Member") certifying to Related [Sub] that there is a bona fide dispute between the Disputing Alliance Member and the other members and/or the managers of Alliance Network (the "Affected Alliance Members") or any of them regarding the parties [sic] respective shares of, and/or the allocation, calculation, timing or distribution of Affiliate Fees, other fees, Cash Available for Distribution, net income or any other amount due Network (or any other Person who is a part of the Alliance Network Group) under this Agreement and specifying the items that are in dispute (the "Disputed Items"), then notwithstanding any provision in this Agreement to the contrary, Related [Sub], shall retain from any future distributions or payments of the Disputed Items due Network, (or any other person who is part of Alliance Network Group) on account of the Disputed Items with respect to any Phase of the [Center] or Ancillary Business in which Network has a direct, or indirect, Interest and shall instead, deposit such amounts (the "Disputed Amounts") in a segregated bank account of the Company until such time as either: (i) the parties to such Dispute direct and authorize Related [Sub], by joint written instructions, to release the Disputed Amount; or (ii) Related [Sub] receives a copy of the decision of the Person arbitrating such dispute under the Provisions of Article [XI] of Alliance Network Operating Agreement, subject in any case to the superior rights of Related [Sub] and any [Center] Lender to such Disputed Amounts in accordance with the this [sic] Agreement.

JX 6 § 12.18(g).

Section 12.18(h) of the WMCV Operating Agreement defined the nature of Related Sub's obligations when performing its duties under Section 12.18(g). It stated:

> (i) In no event shall Related [Sub] be deemed to be a fiduciary in connection with any monies held by it pursuant to Section 12.18(g).

6

(ii) Related [Sub] shall be protected in acting or refraining from acting as provided for in Section 12.18(g) on any instrument believed to be genuine and to have been signed or presented by the proper party or parties.

(iii) Related [Sub] shall have no liability under, or duty to inquire into the terms and provisions of Section 12.18(g).

(iv) It is agreed that [Related Sub's] duties pursuant to Section 12.18(g) are purely ministerial in nature and that Related [Sub] shall incur no liability whatsoever for any action taken or omitted by Related [Sub] pursuant to Section 12.18(g) except for willful misconduct, gross negligence, or bad faith, so long as Related [Sub] acted in good faith.

(v) If Related [Sub] is uncertain as to its obligations pursuant to Section 12.18(g) or if any conflicting demands shall be made upon Related [Sub] pursuant to Section 12.18(g), Related [Sub] shall not be required to determine the same or to take any action thereon other than continuing to retain Disputed Amounts and depositing them as provided for in Section 12.18(g), rather, Related [Sub] may await settlement of the controversy.

(vi) Network and each of the members of the Alliance Network shall jointly and severally indemnify Related [Sub], its officers, directors, partners, employees, agents and counsel (each herein called a "Section 12.18(g) Indemnified Party") against, and hold each Section 12.18(g) Indemnified Party harmless from, any and all losses, costs, damages, expenses, claims and attorney's fees, including but not limited to costs of investigation, litigation, suffered or incurred by any Section 12.18(g) Indemnified Party in connection with or arising from or out of any action taken or omitted by Related [Sub] pursuant to Section 12.18(g), except such acts or omission as may result from the willful misconduct or gross negligence or bad faith of such Section 12.18(g) Indemnified Party. Related [Sub] shall not be liable for any tax liability or loss on investments arising from Related[] [Sub's] retention of Disputed Amounts and deposit thereof as provided for in Section 12.18(g).

JX 6 § 12.18(h).

## C.   Samson, Kashani, And Related Parent Try To Buy Out NAMA.

Related Parent's arrival altered the relationship among the Alliance Network members. With Related Parent as their new partner, Samson and Kashani no longer

needed NAMA, and they no longer had to worry about NAMA's Veto Rights. Related Parent did not have much use for NAMA either. But Samson and Kashani were helping Related Parent develop and manage the Center, and they soon found common ground.

In 2004, Samson, Kashani, and Related Parent reached an agreement to develop a condominium project (the "Icon Center"). Samson and Kashani received the right to invest on favorable terms, thereby violating a prohibition in the Alliance Network Operating Agreement against Samson, Kashani or any of their affiliates "deriv[ing] any personal benefit, salary, compensation or other benefit" from "Related [Sub], its subsidiaries, or affiliates" other than as permitted by the Alliance Network Operating Agreement. JX 5 at § 15. Related Parent, Samson and Kashani did not disclose the Icon Center project to NAMA, and NAMA did not learn of it until 2007.

Samson, Kashani, and Related Parent also tried to induce NAMA to sell its interest in the Center. In June 2005, after refinancing Phase 1, WMCV had $18 million available for distribution to the Alliance Network members. At the time, Marty Burger was the point person for Related Parent. Samson and Burger agreed to keep the existence of the funds secret and hold them within WMCV. Samson thought NAMA might sell, and Samson and Burger believed that withholding the distributions and keeping the amount of cash secret would lead the Alliance Brothers to undervalue their interest and be more eager to exit. Samson changed his mind about withholding the distribution when he needed money to buy into the Icon Center. At first, Burger did not want to jeopardize the plan to buy out NAMA, but he gave in to Samson. WMCV ended up distributing the funds at the end of June.

The next year, Related Parent, Samson, and Kashani tried again. This time, WMCV had $12.8 million available for distribution. Once again, NAMA did not know that the funds were available. Samson thought the Alliance Brothers would sell, so he did not want to make a distribution or disclose the existence of the funds. Burger was skeptical and sought guidance from Jeff Blau, the President of Related Parent. Blau agreed to withhold the funds to facilitate a possible buyout of NAMA's interests. Network's 50% share of these funds would end up as part of the Disputed Amounts.

D.     **The Phase 3 Financing**

As noted, the plan for the Center called for developing eight buildings in eight separate phases. Phase 1 was completed in July 2005 at a cost of approximately $220 million. Phase 2 was completed in January 2007 at a cost of approximately $300 million. In September 2006, as Phase 2 was nearing completion, Related Parent, Samson, and Kashani began planning for Phase 3. On September 20, 2006, Related Parent entered into a term sheet with Hypo Real Estate Capital Corporation ("Hypo") to finance the construction of Phase 3. Hypo conditioned the loan on Related Parent and Network entering into a master lease agreement for the Phase 3 space (the "Master Lease Agreement"). Under the Master Lease Agreement, Network would fund half of the monthly rent payment due for the Phase 3 space; Related Parent would fund the other half. Related Parent guaranteed Network's half, making Related Parent liable for the full amount. As security for its portion, Network deposited approximately $11 million in an escrow account (the "Network Escrow"), which Samson and Kashani controlled. Related Sub was not a party to the Master Lease Agreement.

9

By letter dated October 20, 2006, Alliance Network made a capital call on its members for Phase 3 (the "Funding Notice"). The Funding Notice explained that as a 50% owner of Phase 3, Network was obligated to contribute $46.4 million, comprising (i) a $6.75 million equity contribution, (ii) $25.65 million to satisfy Network's share of pre-leasing requirements for Phase 3, and (iii) $14 million cash collateral for advances of fees due to Network. The Funding Notice called on NAMA to fund 70.35% of this amount, or $32,642,400. The Funding Notice stated each member would have until November 20, 2006, to provide its share; otherwise, the member would be subject to the remedies in the Alliance Network Operating Agreement, including a possible forced sale of its interest.

NAMA disputed the Funding Notice. NAMA contended that Samson and Kashani had increased the amount of capital that WMCV needed, knowing that NAMA would have to fund approximately of 70% of it and expecting that NAMA would not be able to do so, thereby subjecting NAMA to a forced sale. NAMA further contended that Samson and Kashani conspired with Related Parent and Hypo to secure benefits for themselves out of the grossed-up figure. For example, NAMA contended that the contribution of $14 million as cash collateral was included so that Hypo could increase its loan amount dollar for dollar. That, in turn, allowed Samson and Kashani to receive back approximately $7 million as an advance payment of their portion of certain fees payable to Network. Samson and Kashani came out ahead, because the $7 million far exceeded the $1.4 million that Prime paid as its share of the grossed-up figure. NAMA also contended that Samson and Kashani had failed to provide NAMA with the information necessary to evaluate the Funding Notice.

10

Notwithstanding its objections, NAMA elected to invest in Phase 3, but did on certain conditions. Samson and Kashani rejected NAMA's conditions. On December 14, 2006, Samson and Kashani notified NAMA that it had not timely accepted the capital call. The next day, Samson and Kashani informed their business associate, Mendi Gertner, that NAMA had defaulted. Samson and Kashani then purported to sell NAMA's interests to Gertner's entity, Fordgate World Market Center, LLC ("Fordgate").

## E.     The Section 12.18 Notices

In December 2006, NAMA sent Related Sub four notices pursuant to Section 12.18 (the "Section 12.18 Notices"). The Section 12.18 Notices identified twelve points of dispute among NAMA, the other members of Alliance Network, and Samson and Kashani as managers of Alliance Network (the "Disputed Items"), and they called on Related Sub to place all amounts due to Network in a segregated account pending resolution of the Disputed Items. These funds became the Disputed Amounts.

After receiving the Section 12.18 Notices, Samson, Kashani, and Related Sub formally allied against NAMA. By agreement dated December 21, 2006, Network and Related Sub committed, among other things, to "develop and . . . pursue a common defense in connection with all NAMA Claims (including, without limitation, coordination of any counterclaims against NAMA)." JX 37 at 8 (the "Joint Defense Agreement"). They agreed that any claims against Related Parent or WMCV "shall be jointly defended with counsel mutually acceptable to the Managing Members," *i.e.* Network and Related Sub. *Id.* They also agreed that Network would indemnify Related Parent and Related Sub

11

for all costs, expenses, and liabilities with respect to claims by NAMA. *Id.* at 6-7. NAMA did not learn of the Joint Defense Agreement until December 2008.

**F.     The Segregation Action**

On December 19 and 28, 2006, NAMA asked Related Sub to confirm, in writing, that WMCV had not made any distributions to Network since Related Sub's receipt of the first Section 12.18 Notice and that WMCV would not make any distributions until the Disputed Items were resolved. Related Sub refused to provide confirmation. NAMA responded by filing suit in this court seeking specific performance of Related Sub's obligation under Section 12.18 to segregate funds (the "Segregation Action").

On May 14, 2007, the parties resolved the Segregation Action by stipulation, which the court approved as an order (the "Segregation Order"). Related Sub acknowledged that, since December 2006, it had deposited more than $11 million into a segregated account pursuant to Section 12.18(g). The Segregation Order provided that

> WMCV shall continue to maintain the Account and all sums deposited into the Account (plus interest) until such time as either:
>
> (i) the parties to such Dispute direct and authorize Related [Sub], by joint written instructions, to release the Disputed Amount; or (ii) Related [Sub] receives a copy of the decision of the Person arbitrating such dispute under the provisions of Article [XI] of Alliance Network Operating Agreement, subject in any case to the superior rights of Related [Sub] and any Center Lender to such Disputed Amounts in accordance with the WMCV Operating Agreement . . . (the "Release Event").

Segregation Order, ¶ 1. This language paralleled the language of Section 12.18(g).

Both NAMA and Related Sub understood the Segregation Order to mean that Related Sub could not release the Disputed Amounts until the Disputed Items were

12

resolved. Both NAMA and Related Sub expected that the Disputed Items would be resolved by a pending arbitration that Samson and Kashani had initiated..

**G.      The Arbitration**

On March 26, 2007, after NAMA filed the Segregation Action, Samson and Kashani caused Network and Alliance Network to commence an arbitration proceeding (the "Arbitration"). Samson and Kashani filed personally as co-claimants in their capacities as managers of Alliance Network. The demand named as respondents NAMA and the Alliance Brothers. The demand alleged that NAMA failed to tender its capital contribution for Phase 3 and thus forfeited its right, title, and interest in Alliance Network and in any future phase of the Center, except for distributions on Phase 1.

In October 2007, the Alliance Brothers moved for dismissal to the extent the demand named them individually, arguing that they only signed the Alliance Network Operating Agreement on behalf of NAMA, not as individuals. The Panel granted the motion.

In November 2007, NAMA filed a counter-demand which named as respondents the purported members of Alliance Network (Prime, Crescent, and Fordgate) and Samson and Kashani as managers. The counter-demand alleged that Samson and Kashani tried to force NAMA out of the Center. NAMA sought a declaration that NAMA retained its membership interest, damages, and the removal of Samson and Kashani as managers.

In May 2008, Prime filed a counter-counter-demand against NAMA and the Alliance Brothers. The Alliance Brothers again sought and obtained dismissal because they had not signed the Alliance Network Operating Agreement as individuals.

13

In an effort to limit the Panel's ability to impose liability on them personally, Samson and Kashani took the position that they were parties to the Arbitration only in their capacity as managers and not as individuals. To address this odd defense, NAMA moved to confirm that Samson and Kashani were parties to the Arbitration as individuals. In November 2008, the Panel granted NAMA's motion, concluding that "Mr. Samson and Mr. Kashani were each sued as individuals." JX 74 at ¶ 1. This ruling backfired on NAMA, because Samson and Kashani then moved for dismissal on the same grounds twice offered by the Alliance Brothers, namely that they had not signed the Alliance Network Operating Agreement as individuals. This was a perplexing argument for Samson and Kashani to make, because they had commenced the Arbitration as co-petitioners in their capacities as individuals who served as managers of Alliance Network. Unlike the Alliance Brothers, Samson and Kashani had executed the Alliance Network Operating Agreement and were parties to it as managers. The Alliance Network Operating Agreement confirmed that, as managers, Samson and Kashani owed both contractual and fiduciary duties to Alliance Network and its members. Yet based a goose-and-gander approach, the Panel dismissed Samson and Kashani from the Arbitration.

NAMA previously had filed an action in New York state court against a law firm that had represented concurrently WMCV, Related, Network, and Samson and Kashani in the Phase 3 financing. After Samson and Kashani were dismissed from the Arbitration, NAMA added them as defendants in the New York action. That lawsuit remains pending.

In a marked reversal of position, Samson and Kashani then filed an action in California federal court to compel NAMA to arbitrate the claims brought against them in

14

the New York action, *which were the very same claims that Samson and Kashani had convinced the Panel to dismiss.* The federal court held that Samson and Kashani had acted in bad faith by adopting contradictory positions and making inconsistent arguments depending on what suited their convenience at the time. *Samson v. NAMA Hldgs., LLC*, 637 F.3d 915, 928, 931-34 (9th Cir. 2011).

The Arbitration would last until 2009. During this time, Related Sub continued to hold the Disputed Amounts.

## H. Related Parent's Desire To Access The Network Escrow

In late 2008, Phase 3 fell short of required occupancy levels, triggering Network and Related Parent's obligation to pay at least $1.2 million per month under the Master Lease Agreement. Network could not pay its portion, leaving Related Parent responsible as guarantor for entire amount. By December 2008, Related Parent had paid approximately $3 million on Network's behalf. As readers will recall, 2008 was a difficult time for the economy in general and for real estate firms in particular. Related Parent was highly motivated to limit its exposure under the Master Lease Agreement, and it wanted to use the Network Escrow to pay Network's share.

By this time, Burger was no longer Related Parent's point man for the Center. Michael Brenner, an executive vice-president and CFO of Related Parent, had taken over that role. Brenner also served as an executive vice-president of Related Sub and as Related Sub's authorized representative for WMCV matters. Brenner asked Samson whether he and Kashani would cause Network to consent to Related Parent's use of the Network Escrow for Network's share of the payments due under the Master Lease

15

Agreement. Samson responded that they only would consent if Related Parent provided them with a personal loan of $1.5 million.

On December 31, 2008, Brenner e-mailed Blau, the President of Related Parent, and summarized the status of his discussions with Samson:

> I have been discussing the release of the $11.2 million "Network Master Lease Escrow" with Shawn so that we don't end up funding the entire Master Lease payment.
>
> . . . .
>
> As part of his "settling" this matter with us—Shawn has asked for a $1.5 million loan for him, Jack and Fordgate. He is trying to tie it all together—which is not appropriate.

JX 85. In addition to not being appropriate, the loans would have violated Section 15 of the Alliance Network Operating Agreement, which prohibited Samson and Kashani from "deriv[ing] any personal benefit, salary, compensation or other benefit" from "Related [Sub], its subsidiaries, or affiliates" other than as permitted by the Alliance Network Operating Agreement. JX 5 at § 15. Related Parent initially did not take any action on the escrow-access-for-personal-loan trade.

## I.     Related Parent Tries To Extend A Personal Loan To Samson And Kashani.

In April 2009, Samson again proposed the escrow-access-for-personal-loan trade, explaining that WMCV had not made any distributions from the Center since 2006 and that he and Kashani desperately needed funds. This time, having made additional payments under the Master Lease Agreement, Related Parent felt less inhibited by the impropriety of the request. The hurdle was collateral.

16

Brenner asked Jordan Bailowitz to consider whether Related Parent could obtain a security interest in Prime's share of the Disputed Amounts. Bailowitz asked Samson for a "flow of funds" estimate showing the portion of the Disputed Amounts "distributable to each of the members of Alliance Network" upon release. JX 101. Samson argued that Prime would be entitled to approximately $4.8 million of the Disputed Amounts, but Bailowitz could not find any way that Related Parent could be assured of obtaining a security interest in those funds.

While Bailowitz was evaluating the availability of the Disputed Amounts, Samson pushed hard for the loan. He asked Bailowitz to "expedit[e]" his review, and he begged Benner to "please finalize this matter." JX 112. On June 2, 2009, Brenner told Samson that Related Parent would not provide a loan without suitable collateral.

**J.     The Possibility Of A Distribution Of The Disputed Amounts**

At this point, the prospect of an imminent decision by the Panel caused Samson to focus on the Disputed Amounts themselves as a potential source of liquidity. Between January 5 and March 19, 2009, the Panel had conducted a merits hearing that included twenty-six days of evidence. Samson and Kashani attended, and Samson testified for twelve days. The Panel asked for post-hearing briefing, which was completed on May 29.

In early June 2009, Samson thought the Panel might issue a decision soon, so he prepared a draft demand letter that he contended would be sufficient to cause Related Sub to release the Disputed Amounts. On June 8, Samson asked Brenner to review the draft, writing: "We expect the decision of the arbitrators this month. Please review the attached

17

draft so that you are in a position to instruct and authorize the transfer of funds when we forward to you the decision of the arbitrators." JX 119.

After receiving the letter, Brenner reviewed the pleadings in the Arbitration to "understand the issues" and "get prepared for anything that might have a bearing on the distribution of this money." JX 123; Brenner[1] 82-91. On June 18, 2009, Brenner e-mailed Samson his response:

> In terms of releasing the money in escrow—based on a reading of the relevant documents, our lawyers think that the money was escrowed because there was a dispute about the distribution/allocation of the money in escrow (among other things). Will the arbitration decision address the appropriate distribution of the money in escrow?
>
> I am concerned about walking into a lawsuit from your partners.
>
> I think our lawyers should talk about the precise conditions for release of the funds. We don't think that it is entirely a 12.18(g) matter if the arbitration decision does not address the issues giving rise to the escrow.

JX 130. In short, Brenner did not agree that any decision from the Panel automatically would trigger a release of the Disputed Amounts. Brenner and his lawyers believed that the Disputed Amounts could not be released unless the Arbitral Decision resolved the Disputed Items. Related Sub would take the opposite position when making the arguments to this court that led to the issuance of the Summary Judgment Opinion.

Brenner and Samson also disagreed about the implications of the Segregation Order. Samson argued that the Segregation Order controlled, rather than Section 12.18. Bailowitz responded on Brenner's behalf that the Segregation Order was "not intended to modify [Related Sub's] obligations with respect to the account under the agreement, so that all terms of the agreement relating to the account, including 12.18(h), continue to

18

apply." JX 133. Here again, Related Sub would take the opposite position when making the arguments to this court that led to the issuance of the Summary Judgment Opinion.

## K.    The Arbitral Decision

On July 28, 2009, the Panel issued the Arbitral Decision, which dealt primarily with the Phase 3 capital call. The Panel found that Samson and Kashani "had materially breached their obligation to NAMA . . . in ways that directly impaired the Funding Notice from serving its intended purpose." JX 138 at 12. The Panel concluded that despite serving as the managers of Alliance Network and as the authorized representatives of Alliance Network at WMCV, Samson and Kashani

> failed to conduct any sort of meaningful or adequate review of [the Funding Notice] to determine whether it was in the best interests, or "inimical" to the best interests, of Alliance Network or its affiliate. . . . In general, the evidence established that, subsequent to the formation of WMCV, Samson and Kashani largely abdicated their contractual duties to act on behalf of Alliance Network, and instead shifted their allegiance to protecting Prime's interests and deferring to the wishes of Related [Parent].

*Id.* at 8. The Panel found that "as of the time when NAMA was called upon to determine its response to the Funding Notice, Samson and Kashani had failed to provide NAMA with information respecting the [Center] required under the relevant agreements and necessary to NAMA's ability to rationally evaluate its options for responding to the Funding Notice." *Id.* The Panel also found that in connection with the Funding Notice, Samson and Kashani "failed to provide [NAMA with] material financial information with which to make an informed election, and they did not cure that failure within the time NAMA had to respond to the Funding Notice." *Id.* at 13.

The Panel noted that Samson and Kashani's misconduct entitled NAMA either to reject the Funding Notice outright or accept it as proffered. Instead, NAMA attempted to accept the Funding Notice subject to its own conditions, which rendered its tender ineffective and "constituted a default." *Id.* As a consequence, NAMA lost its rights in Phase 3. NAMA did not lose its other interests in the Center. The Panel held that Samson and Kashani "therefore acted outside their authority when they proposed to seize and sell to Fordgate NAMA's non-Phase 3 rights." *Id.* at 21.

The Panel ordered Alliance Network to pay NAMA damages of $12.75 million, which the Arbitral Decision characterized as "representing NAMA's 70% share of the $18,214,865.95 of proceeds distributed to Alliance Network in June, 2006 . . . ." JX 138 at 24. The Panel also awarded NAMA over $400,000 in monetary sanctions against Network and Alliance Network.

The Arbitral Decision specifically addressed the Disputed Amounts. It stated:

> Prime, Crescent and NAMA shall (i) make all reasonable and necessary efforts to cause Related [Sub] to redistribute to Alliance Network all proceeds of the escrow account held by Related [Sub] at the prior request of NAMA, and (ii) within five business days of its receipt of such funds Alliance Network shall distribute to NAMA its proportionate share of such proceeds, calculated in accordance with the percentage of NAMA's ownership interest in Alliance Network prior to the investment and assignment of any interests to Fordgate.

*Id.* at 24. The Arbitral Decision prohibited Alliance Network from making "any distributions to Prime, Crescent or Fordgate until all property (except the Phase 3 building) pledged to Hypo Bank as collateral for the construction loan for Phase 3 ('Lien Property') is released from such lien and security obligations." *Id.* at 23.

20

Despite Samson and Kashani's dismissal from the Arbitration, much of the Arbitral Decision focused on their conduct. The Panel found them to have acted in bad faith, to have wrongfully withheld the $18 million in distributions in 2005, and to have denied NAMA information to which it was entitled. The Panel recognized, however, that the Arbitration could not resolve NAMA's disputes with Samson and Kashani because of their dismissal from the Arbitration. The Arbitral Decision concluded that "[n]othing in this Final Award is intended to adjudicate or settle any claims of the Parties not subject to this panel's jurisdiction and being pursued in another forum, or any claims by or against entities or persons who are not parties to this arbitration." *Id.* at 25.

## L.    Samson And Brenner Discuss The Arbitral Decision.

On August 9, 2009, Samson e-mailed Brenner, told him about the Arbitral Decision, and suggested they convene a call to discuss it. Brenner reviewed the Arbitral Decision when Related received a copy the next day. During this litigation, Brenner testified that it was "very clear" to him that a Release Event had occurred and that there was "no doubt" in his mind about that fact. Brenner[1] 132. Brenner's testimony was contrary to the position that he and his counsel took in their e-mail exchanges with Samson before the receipt of the Arbitral Decision, when they maintained that a decision alone would not support a release, only a decision that actually resolved the Disputed Items. Consistent with his actual view, Brenner did not release the Disputed Amounts upon receiving the Arbitral Decision.

In an effort to explain why he did not release the Disputed Amounts despite purportedly believing at the time that a Release Event had occurred, Brenner claimed that

21

he waited because he did not "have a letter or any indication that anybody wanted the funds released." Brenner[1] 136. He also claimed the Arbitral Decision—not Section 12.18 or the Segregation Order—required that Related Sub wait for a "request from somebody to release [the Disputed Amounts]." Brenner[1] 136-37. This testimony conflicted with the position Related Sub took when making the arguments to this court that led to the issuance of the Summary Judgment Opinion. At the summary judgment stage, Related Sub contended that the Segregation Order was the operative document and that the Arbitral Decision could not modify Related Sub's obligations under it.

The evidence at trial established that before litigation made it expedient to claim otherwise, Brenner did not believe that he needed a "request from somebody" to release the Disputed Amounts, nor did he think that the Segregation Order was the operative document and that the Arbitral Decision was irrelevant. The evidence at trial showed Brenner and his counsel to have believed that (i) the Segregation Order incorporated the requirements of Section 12.18, (ii) the Segregation Order and Section 12.18 worked together such that a Release Event only would occur once all of the Disputed Items were resolved, and (iii) the Arbitral Decision had not resolved all of the Disputed Items. Consequently, a Release Event had not yet occurred by early August 2009, and Related Sub kept holding the Disputed Amounts.

Over the ensuing weeks, however, Samson would sell Brenner on a *quid pro quo*. Instead of Related Parent providing Samson and Kashani with a personal loan, Related Sub would release the Disputed Amounts to Samson, without prior notice to NAMA,

thereby enabling Samson and Kashani to receive the liquidity they needed. In return, Samson and Kashani would give Related Parent access to the Network Escrow.

## M.    NAMA Asserts A Right To All Of The Disputed Amounts

In correspondence sent after the issuance of the Arbitral Decision, NAMA put Samson and Kashani on notice that NAMA asserted a right to all of the Disputed Amounts and expected to use those funds to satisfy the Panel's damages award. On August 31, 2009, NAMA demanded that parties to the Arbitration

> advise NAMA as to how and when they will satisfy the Award in favor of NAMA, including respecting the efforts which the Panel ordered the parties to undertake in order that Alliance Network can distribute the monies owed to NAMA out of the distributions heretofore made to Alliance Network or Fordgate, and concerning distributions currently being withheld by World Market Center Venture, LLC and/or Related [Sub].

JX 144 at 1.

On September 10, 2009, NAMA wrote a letter to the Panel stating that it was "extremely pleased with and is fully prepared to abide by the [Arbitral Decision] in all respects." JX 149 at 1. NAMA repeated its demand that the other parties join NAMA in taking "the *mutual* steps necessary to accomplish the relief ordered by the Panel." *Id.* at 2 (emphasis added). By citing the need for "mutual steps," NAMA evidenced that it was not anticipating a release of the Disputed Amounts by Related Sub in response to unilateral action by Samson.

No one responded to NAMA's communications. At the time, NAMA was unaware that Brenner and Samson were in fact discussing how to release the Disputed Amounts.

**N.  The Master Lease Expenditures Grow More Burdensome.**

By September 2009, Related Parent had made more payments under the Master Lease Agreement, including approximately $8.5 million on Network's behalf. The increasing financial burden caused Brenner to re-visit the escrow-access-for-personal-loan trade. On September 14, he sent Bailowitz an email with the subject line "Loan to Shawn" and asked, "What do we need to move this forward?" JX 150.

Bailowitz was nonplussed. He thought they had decided against the exchange, and that the Arbitral Decision had only made things worse. He wrote:

> I thought we had concluded that we did not have a comfort level with the collateral that Shawn proposed to put up (ie – his entity's right to share of proceeds in the holdback account). The decision in the arbitration, it seems to me, would make that concern even more acute. It is of course a simple matter to document a loan to Shawn, the question is what he can put up as collateral, does he even have the right to put it up under the loan documents (questionable at best), will he ever see any money from the escrow, given the arbitration decision, etc.

*Id.* Bailowitz's email establishes Related Parent's understanding that if the Disputed Amounts were distributed as contemplated by the Arbitral Decision, Samson and Kashani were unlikely to "ever see any money from the escrow." *Id.*

Brenner, however, moved forward. On September 23, 2009, he had a discussion with Samson, which Samson referenced in an email the next day. Samson wrote:

> Please let me know if you have been able to get Jeff [Blau's] sign off on discussion you and I had yesterday afternoon. I need this to be part of the consent Laura is preparing to get Jack's sign off on the use of the $11 million and Ok to the Hypo term sheet. We also are badly in need of cash given the still frozen status. $1 million transitional loan in exchange for $11 million long term funds should be an easy ok; especially since Jeff [Blau] gave his ok 7 months ago at February market. We just are hurting and need it last week!

24

JX 156. There can be no clearer expression of a proposed *quid pro quo* than "$1 million transitional loan in exchange for $11 million long term funds." Brenner assured Samson that he and Blau were working on it.

On September 28, 2009, Brenner forwarded Samson's e-mail to Blau. Brenner reminded Blau that they had "discussed this before" and agreed to provide the loan because Related Parent "needed [Samson and Kashani's] consent to use [the] $11,500,000 escrow to pay 1/2 of the master lease payments." *Id.* Here again, the *quid pro quo* is explicit. Brenner then expressed discomfort with the exchange, noting that Samson's demand for a loan "feels like extortion—but I think it makes sense in facilitating our access to the funds." *Id.*

## O. Brenner And Samson Orchestrate The Release Of The Disputed Amounts.

At some point after September 28, 2009, Brenner realized that the intermediate step of a loan would be unnecessary if a portion of the Disputed Amounts reached Samson and Kashani. There is no direct evidence as to when that epiphany occurred, but the circumstantial evidence places the event in early October 2009. Before this point, the discussions focused on trading escrow access for a personal loan. But beginning in October 2009, the personal loan dropped off the agenda, and the discussion shifted to choreographing the release of the Disputed Amounts.

Between October 6 and October 9, 2009, Brenner and Samson communicated frequently about the release of the Disputed Amounts. On October 6, Samson told Brenner that he was "going to get a letter that asks for the release of the funds." Brenner[1] at 156. On the morning of October 7, Brenner, Samson, and Katherine

25

Venezia, WMCV's CFO, discussed the "Alliance Network distribution." JX 159. Later that day Samson e-mailed Brenner and Venezia a copy of a demand letter.

After reviewing the demand letter, Brenner asked Samson to revise it to state that Network would redistribute the funds "in accordance with the arbitrator's decision." JX 163. This was a fig leaf. Brenner knew from his discussions with Samson that he was not going to hold the Disputed Amounts as contemplated by the Arbitral Decision. Samson was going to wire the funds out immediately, with a portion going to entities that he and Kashani controlled. Samson said he would make the revision and told Brenner that the "formal notice" would be delivered on Friday, October 9. JX 166.

On October 7, 2009, Brenner asked Samson if NAMA knew about the planned release. In response, Samson sent Brenner a memorandum arguing that notice to NAMA was not required. To this reader, the memorandum is not persuasive. It appears to be window-dressing designed to give Brenner a basis to claim that Related Sub had no obligation to NAMA.

Later that day, Brenner sent Samson a draft letter that he proposed to have Related Sub send to NAMA on October 9, 2009, informing NAMA that the Disputed Amounts had been released. Samson instructed Brenner not to send the letter until "after Network confirms with its bank receipt of the funds on Friday." JX 170. Samson also asked Brenner not to e-mail the letter, but instead to deliver it via Federal Express and First Class Mail. Because Samson intended to have Related Sub release the funds on Friday, this meant NAMA would not receive the letter until the following week.

26

During this litigation, Samson and Brenner maintained that they made the change in the means of delivery because notice by e-mail was not contemplated by Section 12.18. That explanation was pretextual. According to Brenner's testimony at trial (although not his contemporaneous belief), Section 12.18 did not govern the release at all, and notice to NAMA was not required. Brenner and Samson actually made the change to prevent NAMA from receiving notice until after the Disputed Amounts were gone. Samson concurrently provided Brenner and Venezia with wire instructions for transferring the funds to Network.

As planned, Samson sent the formal demand letter from Network on October 9, 2009. Brenner authorized the release at 9:46AM PT, and the wire went out eleven minutes later. Contrary to the representations to the court made by Related Sub's non-Delaware counsel, that fast turnaround only was possible because of the prior coordination among Samson, Brenner, and Venezia, which included setting up the wires the day before. The total amount wired was $11,802,038.88. After the release, Related Sub's counsel sent NAMA the letter that Brenner and Samson had prepared, along with a copy of the record of the wire transfer. At 3:30PM PT, Related Sub's counsel e-mailed Samson and Brenner to confirm that the letter had been sent, as planned, by Federal Express and First Class Mail.

Upon receiving the Disputed Amounts, Samson immediately caused them to be transferred to an Alliance Network account, then wired to Crescent and Prime the shares of the Disputed Amounts that they would have received if the Arbitral Decision had

27

never been rendered. Of the $11,802,038.88 million released by Related Sub, Prime received $4,807,108, and Crescent received $1,087,283.

After the Disputed Amounts were distributed, Samson's demands for a personal loan ceased. On November 19, 2009, Samson and Kashani formally provided Network's consent to Related Parent to use the Network Escrow.

## P.     This Litigation

As Brenner and Samson had planned, NAMA did not learn of the release until Monday, October 12, 2009. On October 14, NAMA sent a letter to Alliance Network, Samson, and Kashani objecting to the release. On October 21, NAMA sent a letter to Related Sub, accusing it of acting in concert with Samson and Kashani.

On December 8, 2009, Related Sub and WMCV filed this action seeking declarations that a Release Event occurred when Related Sub received a copy of the Arbitral Decision and that Related Sub properly released the Disputed Amounts after receiving the demand from Samson. On January 11, 2010, the plaintiffs moved for partial summary judgment.

On April 30, 2010, this court granted the plaintiffs' motion. The Summary Judgment Opinion held that the Segregation Order was the operative document for determining whether a Release Event had occurred, that the contract provisions at issue were "clear and unambiguous," and that "a Release Event occurred on August 10, 2009, when Related [Sub] received a copy of the Arbitration Award," SJ Op., 2010 WL 1756876, at *5. The Summary Judgment Opinion also held that Related Sub was not required to wait until all of NAMA's disputes with Samson and Kashani were resolved or

to obtain NAMA's consent to the release. *Id.* at \*6. In making these rulings, the court credited arguments advanced by Related Sub. Each of these positions has since been shown to be contrary to what Related Sub's principal decision-maker and its counsel actually believed about what Section 12.18 meant and required. The evidence as to their actual beliefs was clear and convincing.

In addition, the Summary Judgment Opinion rejected NAMA's position that Related Sub was required to release the funds in accordance with the Arbitral Decision's terms, finding that "the Arbitration Award could not modify [WMCV] and Related [Sub]'s obligations under the [Segregation Order]." *Id.* at \*7. Here too, the court credited an argument advanced by Related Sub that was subsequently shown, by clear and convincing evidence, to be contrary to what Related Sub's principal decision-maker and its counsel actually believed.

Instead, the Summary Judgment Opinion found that Related Sub "complied with the [Segregation Order] by releasing the Disputed Funds to Network Sub, the entity designated by the [Segregation Order] as being entitled to the Disputed [Amounts]." *Id.* At the time, however, neither NAMA nor the court knew what Related Sub and its non-Delaware counsel knew.

NAMA filed a timely notice of appeal from the Summary Judgment Opinion. While the appeal was pending, NAMA discovered evidence of the communications between Brenner, Network, Samson, and Venezia regarding the release of the Disputed Amounts before the sending of the October 9 demand letter. On June 30, 2011, NAMA

29

filed a Rule 60(b) Motion for Relief from Summary Judgment. NAMA argued that Related Sub acted in concert with Samson and Kashani to release the Disputed Amounts.

On August 25, 2011, the court granted NAMA's Rule 60(b) motion as to its claim for breach of the implied covenant of good faith and fair dealing, finding that NAMA "could establish a claim for breach of the implied covenant of good faith and fair dealing on interstitial matters not directly covered by the plain language" of the WMCV Operating Agreement or the Segregation Order. JX 248 ¶ 2. The court did not grant relief as to its earlier ruling on the plain language of the Segregation Order.

## Q.    NAMA's Lawsuit Against Related Parent

On October, 8, 2012, NAMA filed a new action against Related Parent alleging tortious interference with the Segregation Order and the WMCV Operating Agreement, as well as tortious interference with the implied covenant of good faith and fair dealing inherent in both agreements. On March 25, 2013, the court consolidated the new action with the earlier cases and realigned the parties so that NAMA was the plaintiff. The consolidated action proceeded through discovery and trial.

## II.    LEGAL ANALYSIS

Under the Summary Judgment Opinion, the Segregation Order remains the operative document for purposes of evaluating Related Sub's contractual obligations. SJ Op., 2010 WL 1756876, at *5. NAMA proved at trial that Related Sub breached the implied covenant of good faith and fair dealing inherent in the Segregation Order and is liable to NAMA in the amount of $5,894,391. NAMA also proved at trial that Related

Parent tortiously interfered with Related Sub's obligations and is jointly and severally liable with Related Sub.

## A. The Implied Covenant Of Good Faith And Fair Dealing

NAMA proved at trial that Related Sub breached the implied covenant of good faith and fair dealing by continuing to hold the Disputed Amounts after a Release Event had occurred, then agreeing with Samson on a *quid pro quo* in which Related Parent received access to the Network Escrow. As its part of the *quid pro quo*, Related Sub arranged with Samson to release the Disputed Amounts in a manner that enabled Samson and Kashani to pocket a portion personally and defeat NAMA's ability to collect the damages awarded in the Arbitral Decision. Assuming that Related Sub could have complied with its custodial obligations by releasing the Disputed Amounts upon receipt of the Arbitral Decision, Related Sub nevertheless breached the implied covenant by continuing to hold the Disputed Amounts and then working with Samson to orchestrate their release.[2]

---

[2] In light of the evidence presented at trial, it is open to serious question whether Related Sub could have complied with its obligations under the Segregation Order by releasing the Disputed Amounts upon receipt of the Arbitral Decision. The Summary Judgment Opinion held that it could, and this reading of the Segregation Order remains correct as a technical and precise application of its plain language. But the evidence at trial demonstrated overwhelmingly that everyone expected that any arbitral award rendered as part of the dispute resolution process under Section 12.18 would resolve completely the underlying disputes between the Alliance Network members that had triggered Related Sub's obligation to segregate funds. The evidence at trial further demonstrated that the Arbitral Decision did not, in fact, resolve the disputes. Related Sub's principal decision-maker and his counsel contemporaneously believed that Related Sub had an obligation to continue holding the Disputed Amounts, notwithstanding the technical language of the Segregation Order, until the disputes were resolved. NAMA shared that belief. Only Samson contemporaneously argued otherwise, and he did so because he wanted the money. Related Parent's contemporaneous documents show that its representatives did not trust Samson,

31

### 1. The Legal Standard

Under Delaware law, "the implied covenant attaches to every contract." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). A claim for breach of the implied covenant "is contractual." *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member*, 50 A.3d 434, 439 (Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013). As such, the elements of an implied covenant claim are those of a breach of contract claim: "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

"The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement." *Allen v. El Paso Pipeline GP Co., LLC*, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014). "When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Id.* Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied

---

and his testimony at trial was singularly lacking in credibility. But Samson eventually convinced Related Parent to cause Related Sub to release the Disputed Amounts, despite its contrary belief, as part of the *quid pro quo*. NAMA has argued that by doing so, Related Sub breached an implied obligation to continue holding the Disputed Amounts until there was an actual resolution of the dispute, and that Related Parent tortiously interfered with that obligation. Given the disposition of the case, this decision does need not reach that argument, which nevertheless has substantial force.

covenant might fill. *Id.* A court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at \*10 (Del. Ch. May 7, 2008).

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled." *Allen*, 2014 WL 2819005, at \*11.

> The most obvious reason a term would not appear in the parties' express agreement is that the parties simply rejected that term ex ante when they articulated their contractual rights and obligations. Perhaps, for example, the parties . . . considered the term, and perhaps [after] some give-and-take dickering, the parties agreed the term should not be made part of their agreement. They thus rejected the term by purposefully omitting the term.

Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 Del. J. Corp. L. 1, 28 (2013) (footnote omitted). The implied covenant should not be used to fill the gap with a rejected term because doing so would grant a contractual protection that the party "failed to secure . . . at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004). A court must not use the implied covenant to "rewrite a contract" that a party "now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. "Parties have a right to enter into good and bad contracts, the law enforces both." *Id.*

33

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.). Even the most skilled and sophisticated negotiators and drafters will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect." *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010). In addition, the parties may have had "understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting CORBIN ON CONTRACTS § 570, at 601 (Kaufman Supp. 1984)).

"Under these or other circumstances, it may be appropriate to fill a gap using the implied covenant." *Allen*, 2014 WL 2819005, at *11. "Delaware courts apply the implied covenant rarely, and only in narrow circumstances." *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (Strine, V.C.). Invoking the doctrine is a "cautious enterprise." *Nemec*, 991 A.2d at 1125 (internal quotation marks omitted). Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled." *Dunlap*, 878 A.2d at 442 (internal quotation marks omitted). Its use should be "rare and fact-intensive, turning on issues of compelling

34

fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

Assuming a gap exists and the court determines that it should be filled, the court must determine how to fill it. At this stage, a reviewing court does not simply introduce its own notions of what would be fair or reasonable under the circumstances. Although its name includes the concepts of "good faith" and "fair dealing," the implied covenant does not establish a free-floating requirement that a party act in some morally commendable sense. *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). A breach of the implied covenant also does not necessarily require that a party have acted in bad faith. *ASB Allegiance,* 50 A.3d at 442, 444 (observing that "[t]here are references in Delaware case law to the implied covenant turning on the breaching party having a culpable mental state" but finding that "[t]he elements of an implied covenant claim remain those of a breach of contract claim" and that "[p]roving a breach of contract claim does not depend on the breaching party's mental state."). When used with the implied covenant, the term "good faith" contemplates "*faithfulness to the scope, purpose, and terms of the parties' contract*." *Gerber,* 67 A.3d at 419 (emphasis in original); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."). The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Gerber,* 67 A.3d at 419. These

35

concepts turn not on whether a court believes that a particular action was morally or equitably appropriate under the circumstances, but rather "*on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally*." *Id.* (emphasis in original).

To supply an implicit term, the court "looks to the past" and asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* at 418. The court seeks to determine "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Id.* "Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them . . . ." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997), *aff'd*, 708 A.2d 989 (Del. 1998). The implied covenant "thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). In this manner, the implied covenant "seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber*, 67 A.3d at 418.

## 2. The Implied Obligation To Act As A Neutral Custodian

NAMA advances several obligations that it contends were implicit in the Segregation Order. This decision reaches only one: Related Sub's implied obligation to act as a neutral custodian for the Disputed Amounts. Related Sub breached this implied term by continuing to hold the Disputed Amounts after a Release Event occurred, then releasing them to Samson as part of a *quid pro quo*.

The Summary Judgment Opinion determined that "a Release Event occurred on August 10, 2009, when Related [Sub] received a copy of the Arbitration Award." SJ Op., 2010 WL 1756876, at *5. Assuming Related Sub could have complied with its obligations by releasing the Disputed Amounts on August 10,[3] Related Sub waited to release the Disputed Amounts until October 9.

The Segregation Order does not contain language addressing what steps Related Sub was obligated to undertake if it chose to continue acting as a contractual custodian for the Disputed Amounts *after* a Release Event had occurred. The Summary Judgment Opinion recognized the absence of any specific contractual provision by holding that Related Sub did not breach any provision of the Segregation Order by continuing to hold the Disputed Amounts. *Id.*

The absence of language in the Segregation Order governing Related Sub's continued retention of the Disputed Amounts gives rise to a gap that the implied covenant

---

[3] *But see* n.2, *supra*.

can potentially fill. NAMA argues that as long as Related Sub held the Disputed Amounts, Related Sub had an implied obligation to act as a neutral custodian.

The Segregation Order does not contain language requiring that Related Sub act as a neutral custodian for the Disputed Amounts, but this expectation was "so fundamental that [the parties] did not need to negotiate about [it]." *Katz*, 508 A.2d at 880. It was a core term that the parties "would have agreed to themselves" and made explicit if they had "considered the issue in their original bargaining positions at the time of contracting." *Gerber*, 67 A.3d at 418.

A party empowered to act as a custodian for property in dispute, such as an escrow agent, is generally expected to act neutrally regarding the parties to the dispute.[4] Authorities from other jurisdictions emphasize that an escrow agent has an obligation to act neutrally.[5] This expectation flows from the rule that "an agent who acts on behalf of

---

[4] *See, e.g.,* 30A C.J.S. *Escrows* § 3 ("Upon receiving matters in escrow and the principals' written instructions or agreement, the escrow agent holds the matters in escrow as a neutral third party until the happening of a specified event or the performance of a prescribed condition, as outlined in the escrow instructions."); *see also* Law of Sec. Trans. Under the UCC ¶ 7.08 ("The term 'escrow' indicates a relationship where a writing is delivered by an obligor into the hands of a neutral third party, to be held until the happening of a condition, and then delivered to the obligee."). Upon reflection, the proper legal framework for analyzing the custodial relationship might well be bailment, with the Alliance Network members acting as co-bailors and Related Sub serving as a gratuitous bailee. *See*, *e.g.*, 8A Am. Jur. 2d *Bailments* § 1; 8 C.J.S. *Bailments* § 18. The parties have not discussed the law of bailment, so this decision eschews that analytical framework.

[5] *See Bell v. Safeco Title Ins. Co.*, 830 S.W.2d 157, 160-61 (Tex. App. 1992) (explaining that an escrow agent has a duty to remain neutral during course of transaction); *Bob Daniels & Sons v. Weaver*, 681 P.2d 1010, 1014 (Idaho Ct. App. 1984) (holding that party could not attempt to make escrow holder his agent because it would compromise escrow holder's neutrality); *Black v. Metro Title, Inc.,* 712 N.W.2d 395, 398 (Wisc. Ct. App. 2006) (noting that an escrow agent may be held responsible "if he or she engages in self-dealing or shows a conflict of interest" or

38

more than one principal in the same matter or transaction owes duties to all principals."

RESTATEMENT (THIRD) OF AGENCY § 3.16, cmt. b (2006).

> Multiple principals may consent that an agent take action on their behalf in the same transaction or other matter. For example, neighbors may authorize a single lawyer to represent their interests in opposing a proposed change in the zoning of nearby property. Additionally, coprincipals may authorize an agent to take action that will result in a contract that binds them jointly. Unless otherwise agreed, authority given by two or more principals jointly includes only authority to act for their joint account.

*Id.* The duty that an agent owes to co-principals includes the duty "not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship." *Id.* § 8.03.

In the current case, when the parties entered into the Segregation Order, they already were parties to Section 12.18. NAMA, Samson and Kashani, and Related Sub had agreed to Section 12.18(g) so that any member of Alliance Network could give written notice of a dispute to Related Sub and cause Related Sub to hold the Disputed Amounts in a segregated account pending the outcome of the dispute. The purpose of Section 12.18(g) was to "require[] Related [Sub] to act as an escrow agent pending resolution of an arbitration among the members or managers of Alliance Network." SJ Op., 2010 WL 1756876, at *2. Section 11 of the Alliance Network Operating Agreement, which established the framework for what became Section 12.18, stated that the dispute resolution mechanism would involve a party holding the Disputed Amounts and include

---

engages in fraud towards one of the parties who established the escrow); *Hertz v. Nordic Ltd., Inc.*, 761 P.2d 959, 962 (Utah Ct. App. 1988) (holding that a party who was not "a stranger or third person" to a transaction did not qualify as an escrow agent).

"standard limitations on liability and other terms and conditions applicable to Persons *acting as escrow agents*." JX 5 § 11(a)(i)(E) (emphasis added). Related Parent, its counsel, and the arbitrators repeatedly spoke of Section 12.18(g) as establishing an escrow arrangement. *See*, *e.g.*, JX 127; JX 130; JX 138; JX 162; JX 196; JX 209; JX 275 at 13; JX 276 at 52. The purpose of the Segregation Order was to memorialize these pre-existing understandings and obligations in the form of a judicial order.

Inherent in the designation of Related Sub as the custodian of the segregated account was an expectation that Related Sub could be trusted to act neutrally pending the outcome of the dispute. In their original bargaining positions, the Alliance Brothers and Samson and Kashani could not know what disputes would arise, how long they would take to resolve, or whom the resolution would favor. When considering the range of possible outcomes from behind this veil of ignorance, their interests were aligned on a basic point: they needed a trustworthy party to act as an honest broker and hold the money until the arbitrators rendered a decision. If either the Alliance Brothers or Samson and Kashani had suspected that Related Sub would not act neutrally and might favor one side or the other, they would not have agreed to designate Related Sub as the account holder. Many businesses provide custodial account services, and it would have been simple to designate an unaffiliated third party to hold the funds.

At trial, Mousa Alliance testified that when he participated in the negotiation of Section 11 of the Alliance Network Operating Agreement, which called for the creation of Section 12.18, he expected Related Sub to act neutrally. Related Sub understood this expectation as well. Brenner knew that NAMA wanted Section 12.18 to protect its

40

interests, and he acknowledged that NAMA "felt that they would be having a dispute with the other partners of Network and they wanted somebody who was not a member of Network to hold the funds or control the funds." Brenner[1] 123.

Other aspects of Section 12.18 reinforce the existence of an implied obligation on Related Sub's part to act neutrally. For example, Section 12.18(g)(iv) provided that

> [i]f Related [Sub] is uncertain as to its obligations pursuant to Section 12.18(g) or if any conflicting demands shall be made upon Related [Sub] pursuant to Section 12.18(g), Related [Sub] shall not be required to determine the same or to take any action thereon other than continuing to retain Disputed Amounts and depositing them as provided for in Section 12.18(g), rather, Related [Sub] may await settlement of the controversy.

Under this subsection, Related Sub was not obligated to pick a side; it could remain neutral. Another example is Section 12.18(h)(vi), which provided that all of the members of Alliance Network "shall jointly and severally indemnify Related [Sub], its officers, directors, partners, employees, agents and counsel" against "any and all losses, costs, damages, expenses, claims and attorney's fees" resulting from actions taken or omitted by Related Sub under Section 12.18(g). The fact that the indemnification obligation ran to all of the members of Alliance Network is consistent with Related Sub serving in a role intended to benefit all of those members' interests. Likewise, Section 15 of the Alliance Network Operating Agreement prohibited Samson and Kashani from entering into business relationships with Related Sub or its affiliates that might undercut the expectation that Related Sub would act neutrally. *See* JX 5 § 15 (precluding Samson and Kashani from "deriv[ing] any personal benefit, salary, compensation, or other benefit from . . . Related, its subsidiaries or affiliates"); Trial Tr. 23 (M. Alliance) ("[W]e wanted

41

to make sure that Related [Sub] would remain a neutral side, so that [Samson and Kashani] would not have combined business or interest so that they would be interested parties, that they would have influence over the decisions of Related [Sub].").

Against the existence of any implied obligation, Related Sub cites two different provisions. First, Section 12.18(h)(i) stated that "[i]n no event shall Related [Sub] be deemed to be a fiduciary in connection with any monies held by it pursuant to Section 12.18(g)." Second, Section 12.18(h)(iv) provided that "Related[] [Sub's] duties pursuant to Section 12.18(g) are purely ministerial in nature." Neither of these provisions displaced or was inconsistent with the implied obligation of neutrality that Related Sub assumed regarding the Disputed Amounts.

As a threshold matter, once the Alliance Network members made Related Sub their agent for purposes of holding the Disputed Amounts, it is not clear that the disclaimer of fiduciary status in Section 12.18(h)(i) was effective. An agency relationship, as a matter of law, is a fiduciary relationship: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01.

> The scope of an agency relationship defines the scope of an agent's duties to a principal and a principal's duties to an agent. If the relationship between two persons is one of agency as defined in this section, the agent owes a fiduciary obligation to the principal. The word "fiduciary" appears in the black-letter definition to characterize or classify the type of legal relationship that results if the elements of the definition are present and to

42

emphasize that an agency relationship creates the agent's fiduciary obligation as a matter of law.

> As a general matter, the term "fiduciary" signifies that an agent must act loyally in the principal's interest as well as on the principal's behalf . . . . Any agent has power over the principal's interests to a greater or lesser degree. This determines the scope in which fiduciary duty operates. An agent has such power even when the principal holds a superior economic position or possesses greater expertise or acumen.

> To establish that a relationship is one of agency, it is not necessary to prove its fiduciary character as an element . . . . In addition to an agent's fiduciary duties, the agent has a duty to fulfill specific contractual undertakings that the agent has made to the principal and to third parties, as well as to fulfill any duties imposed on the agent by law. Correlatively, a principal can owe duties created by contractual undertakings to the agent . . . .

> Fiduciary duty does not necessarily extend to all elements of an agency relationship, and does not explain all of the legal consequences that stem from the relationship. Fiduciary duty does not operate in a monolithic fashion. Most questions concerning agents' fiduciary duty involve the agent's relationship to property owned by the principal or confidential information concerning the principal, the agent's undisclosed relationship to third parties who compete with or deal with the principal, or the agent's own undisclosed interest in transactions with the principal or competitive activity.

*Id.* § 1.01, cmt. e.

This decision need not address whether the statement that Related Sub would not be a fiduciary was effective when the relationship between Related Sub and the Alliance Network members had all the hallmarks of a limited-scope agency relationship on behalf of co-principals. Accepting that the relationship was solely contractual, the implied covenant still can supply an obligation on Related Sub's part to act neutrally as between its contractual counterparties when dealing with the Disputed Amounts. The fact that an agreement disclaims fiduciary status for a custodian does not imply that the custodian can favor the interests of one claimant over another. At most, the disclaimer of fiduciary

status ensures that the scope of the obligation and the nature of any remedy are governed by principles of contract law.

The same is true for the statement that Related Sub's duties were "purely ministerial in nature." *See* JX 6 § 12.18(h)(iv). This contractual recitation appears designed to take advantage of the rule that

> an agent whose acts on behalf of a party consist solely of ministerial acts that require no exercise of discretion, judgment, or skill does not act on behalf of that party for purposes of determining whether the agent acts adversely to another principal. Thus, one principal's agent who performs only ministerial acts for another does not become a dual agent.

RESTATEMENT (THIRD) OF AGENCY § 8.03 cmt. b. A ministerial act is "performed without the independent exercise of discretion or judgment." BLACK'S LAW DICTIONARY 28 (9th ed. 2009). The "ministerial acts" provision in Section 12.18(h)(iv) defined the scope of Related Sub's authority over the Disputed Amounts and the anticipated extent of Related Sub's activities. It did not eliminate potential liability if Related Sub in fact took steps that went beyond acts that were "purely ministerial in nature," such as when Brenner engaged in extensive communications with Samson but not NAMA, made a discretionary judgment to release the Disputed Amounts in a manner advantageous to Samson and disadvantageous to NAMA, and did so to obtain a *quid pro quo* from Samson and Kashani in the form of access to the Network Escrow. For purposes of the implied covenant, the limitation of Related Sub's anticipated duties to matters that were "purely ministerial in nature" fits with the expectation that Related Sub would not be favoring any of its contractual counterparties over the others. Related Sub committed to act only in a ministerial capacity, suggesting it would not take action to favor either of the

competing sides in their dispute. At trial, Mousa Alliance emphasized this understanding by testifying to NAMA's belief that Related Sub would passively hold the Disputed Amounts and not actively favor either side.

Related Sub breached the implied obligation of neutrality by retaining the Disputed Amounts for months after the point when it now contends a Release Event occurred and arranging with Samson during this period to release the Disputed Amounts into his control, without prior notice to NAMA, thereby ensuring that a portion of the funds would reach Samson and Kashani's pockets, satisfy their need for liquidity, and provide a *quid pro quo* for their consent to Related Parent's use of the Network Escrow. Related Sub could have acted neutrally and avoided a breach by releasing the Disputed Amounts unilaterally as soon as it received a copy of the Arbitral Decision, as Brenner claimed at trial that he believed he could do. Related Sub could have contacted both sides and insisted on their mutual agreement on the terms of a release. Or Related Sub could have stood pat and continued to hold the Disputed Amounts until a court told Related Sub what to do, as contemplated by Section 12.18(h)(v). Other alternatives, including interpleader, might have been possible.

Instead, Related Sub violated the parties' expectation of neutrality by holding the Disputed Amounts until Brenner and Samson reached an agreement on a *quid pro quo*. Brenner's decision to embrace business expediency and favor Samson and Kashani was not an isolated occurrence. Other dealings between Related Parent and Samson and Kashani establish a pattern of undisclosed agreements for their mutual benefit at NAMA's expense, including the withholding of distributions in 2005, the withholding of

distributions in 2006, the Joint Defense Agreement, and the Icon Project. In the Arbitral Decision, the Panel similarly concluded that Related Parent, Samson, and Kashani worked together to NAMA's detriment.

At trial, Related Sub denied the existence of a *quid pro quo*, but there was overwhelming evidence to support it. On September 24, 2009, in an email to Brenner, Sampson described the *quid pro quo*: "$1 million transitional loan in exchange for $11 million long term funds should be an easy ok; especially since Jeff [Blau] gave his ok 7 months ago at February market." JX 156. Four days later, in an email to Blau, Brenner explained that the loan was necessary because Related Parent "needed [Samson and Kashani's] consent to use [the] $11,500,000 escrow to pay 1/2 of the master lease payments." *Id.* In both cases, the *quid pro quo* is explicit. Brenner even likened Samson's demand to extortion, but concluded that he thought accommodating Samson "makes sense in facilitating our access to the funds." *Id.*

Although Brenner denied the existence of a *quid pro quo*, this powerful evidence, plus the numerous conflicts in Brenner's testimony, made it impossible to give any credence to his protestations. Like many who have been caught in a compromised position, Brenner struggled to keep his story straight. When he verified Related Sub's original complaint seeking declaratory relief, he swore that after receiving the Arbitral Decision on August 10, 2009, "[f]or two months, Related [Sub] heard nothing regarding the Funds. On October 9, 2009, however, almost two months after Related [Sub] first received a copy of the Arbitration Decision, Related [Sub] received a demand from Network that Related [Sub] release the Funds." JX 201 ¶ 34. The evidence presented at

46

trial established that this statement was false. Brenner communicated extensively with Samson in the months and days leading up to the release of the Disputed Amounts.

Similarly, when he verified Related Sub's original complaint, Brenner swore, under oath, that "[w]hen Related [Sub] received a copy of the Arbitration Decision, a Release Event had occurred and it no longer had authority to maintain the Funds in a separate account." JX 201 ¶ 30. When seeking summary judgment, Related Sub's non-Delaware counsel embraced this sequence of events, contending that "a release event occurred on August 10. That's the date that Counsel for Related, me, received a copy of the decision . . . . [A] release event occurs when Related [Sub] receives a copy of the decision of the person arbitrating the dispute." JX 208 at 49. Then, during his deposition, Brenner took a different position, testifying that "[Related Sub] needed a request from somebody to release [the Disputed Amounts]." Brenner[1] 136-37. At trial, after NAMA highlighted the inconsistency, Brenner went back to the position he took in the original complaint, contending that the Disputed Amounts could be released as soon as the arbitration ended. Trial Tr. 181 (Brenner Direct). The contemporaneous written evidence established that when Brenner actually considered whether a Release Event had occurred, he did not believe either of these things. He and Bailowitz believed that a Release Event only would occur if the Arbitral Decision resolved the Disputed Items, and they concluded it had not done so. Strangely, instead of advancing in litigation what he honestly believed, Brenner verified a contradictory position, then testified in deposition to a different position, then switched back to the former position at trial.

Brenner also gave strained testimony at trial about his reliance on Samson. As one of his final edits to the demand letter, Brenner asked Samson to state in the letter that the Disputed Amounts would be distributed in accordance with the Arbitral Decision. Brenner claimed at trial that he relied on Samson's representation, believed that Samson would do as he said, and trusted Samson sufficiently that he saw no need to contact NAMA before the release occurred. Trial Tr. 379 (Brenner Cross). Internal communications reveal that Related Parent's representatives in general, and Brenner in particular, deeply distrusted Samson and saw him as someone who would always act in his own interest. *See, e.g.,* JX 39. Given his personal feelings and the factual circumstances surrounding the sending of the demand letter—including Samson and Kashani's desperate need for money, their repeated requests for a personal loan, and the fact that they would not see any of the Disputed Amounts if the funds were distributed as contemplated by the Arbitral Decision—Brenner could not have believed Samson. Brenner knew that the choreographed release of the Disputed Amounts was intended to get money into Samson and Kashani's pockets, in place of loan they had been demanding, as the price for them giving Related Parent access to the Network Escrow. Brenner asked for the representation to give Related Sub plausible deniability.

By holding the Disputed Amounts long after a Release Event had occurred, conspiring with Samson to release the Disputed Amounts in a manner that would enable Samson and Kashani to put money in their own pockets, and using that arrangement as the *quid pro quo* for Related Parent's access to the Network Escrow, Related Sub breached the implied covenant of good faith and fair dealing. The Segregation Order

48

incorporated an implied obligation that Related Sub would act neutrally as to the Disputed Amounts. Related Sub's actions violated the spirit of the agreement and prevented NAMA from receiving the fruits of its bargain. *Dunlap*, 878 A.2d at 442.

### 3. Exculpation Under Section 12.18(h)

In addition to its arguments about the scope of its obligations under Section 12.18, Related Sub contends that it cannot be liable for any breach because of exculpatory language in two subparts of Section 12.18(h). Neither applies.

First, Related Sub relies on the language of Section 12.18(h)(iv), which states that Related Sub has no liability for any violation of Section 12.18(g) "except for willful misconduct, gross negligence, or bad faith." Although the implied covenant does not require that a party act in subjective bad faith, in this case Related Sub in fact engaged in willful misconduct for the subjectively bad faith purpose of harming NAMA and achieving the *quid pro quo*. Section 12.18(h)(iv) therefore does not immunize Related Sub from liability.

Second, Section 12.18(h)(ii) states that Related Sub "shall be protected in acting or refraining from acting as provided for in Section 12.18(g) on any instrument believed to be genuine and to have been signed or presented by the proper party or parties." Related Sub claims it should be "protected" from any liability because it acted in reliance on the demand letter, which it "believed" was "genuine."

In granting Related Sub and WMCV's motion for summary judgment, the Summary Judgment Opinion took a narrow and literal view of the requirement that the letter be genuine. Having held that Related Sub was entitled to release the Disputed

49

Amounts on August 10, 2009, when Related Sub received a copy of the Arbitral Decision, the Summary Judgment Opinion observed that

> [t]he fact that Related [Sub] waited to distribute the Disputed Funds to [Network] until October 9, 2009, after receiving specific release instructions from [Network], does not change the plain meaning of the [Segregation] Order. Related was contractually permitted to release the funds to [Network]—the member to whom the distributions otherwise were owed—upon the occurrence of a Release Event. The Release Event took place on August 10. Related [Sub] appropriately waited for release instructions and then relied upon them.

SJ Op., 2010 WL 1756876, at \*6. The Summary Judgment Opinion later quoted the language of Section 12.18(h)(ii) regarding Related Sub's ability to rely on an instrument "believed to be genuine" and stated that "[t]he Demand Letter was such an instrument." *Id.* at \*7.

The Summary Judgment Opinion made these rulings in response to arguments in which Related Sub disclosed that its counsel had received a copy of the Arbitral Decision from Samson on August 10, 2009, and that it had received the demand letter from Network on October 9, but did not disclose any of the other communications among Samson, Brenner, Venezia, and counsel that occurred during this period. Moreover, Related Sub's submissions and its non-Delaware counsel's partial representations to the court implied that there had not been any. Consistent with what the relevant documents contemplated, Related Sub portrayed itself as a neutral, ministerial actor that had heard nothing about the Disputed Amounts for almost two months after receiving the Arbitral Decision, then dutifully released the Disputed Amounts when it received the demand.

Based on the undisputed factual record as portrayed by Related Sub and its non-Delaware counsel, the court made its rulings at the summary judgment stage. Having considered the implications of those rulings for present purposes, I do not regard the language of the Summary Judgment Opinion as binding for purposes of insulating Related Sub against liability for breach of the implied covenant. The Summary Judgment Opinion held that under the plain language of the Segregation Order, the Release Event occurred when Related Sub received a copy of the Arbitral Decision. For purposes of complying with the literal language of the agreement, Related Sub was free to release the Disputed Amounts at any point after that. Receipt of the demand letter was irrelevant, because Related Sub could have wired the money at any point. The Summary Judgment Opinion's comment about the genuineness of the demand letter was therefore dictum.

If the language of the Summary Judgment Opinion is binding, then grounds exist to grant NAMA relief from this aspect of the ruling.[6] Under Court of Chancery Rule 60(b)(2), relief from judgment can be granted due to newly discovered evidence. In this case, NAMA did not discover the extent of Brenner and Sampson's interactions until

---

[6] *See* Ch. Ct. R. 60(b). This analysis makes the defense-friendly assumption that the Summary Judgment Opinion is a final order. If it is an interlocutory ruling, then under the law of the case doctrine, it can be revisited if subsequent developments provide a compelling reason for doing so. *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."); *Siegman v. Columbia Pictures Entm't, Inc.*, 1993 WL 10969, at *3 (Del. Ch. Jan. 15, 1993) ("Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to reargue every previous ruling." (quoting 1B MOORE'S FEDERAL PRACTICE ¶ 0.404[1], at 117–18 (1992)). Because the grounds described in the text satisfy the Rule 60(b) standard, they also satisfy the lower hurdle imposed by the law of the case doctrine.

after the Summary Judgment Opinion issued, as a result of discovery it pursued in other pending litigation. Even that evidence only gave NAMA a glimpse into the extent of Brenner and Sampson's machinations. It required extensive and persistent motion practice, including three motions to compel, for NAMA to overcome the defendants' aggressive anti-discovery positions and obtain the documents that revealed the true story. Notably, the defendants' discovery strategy in this case resembled Samson and Kashani's approach in the Arbitration, for which they were sanctioned. In light of the Joint Defense Agreement, the similar strategies are hardly surprising.

Separately, under Rule 60(b)(4), a judgment can be vacated due to misrepresentations or other misconduct by an adverse party. Both Brenner and the defendants' non-Delaware counsel participated personally in the release of the Disputed Amounts. Despite knowing what occurred, Brenner verified a complaint which concealed the extent of his interactions with Sampson between August 10 and October 9, 2009, and which portrayed Related Sub as a neutral, ministerial actor that had heard nothing about the Disputed Amounts for almost two months after receiving the Arbitral Decision. Despite knowing facts to the contrary, Related Sub's non-Delaware litigation counsel made arguments to the court based on this misleading presentation and went so far as to represent that Related Sub had been able to wire the funds so quickly on October 9 simply because Related Sub often sent wire transfers to Network. Although I was skeptical at the time about this representation, and said as much when presented with NAMA's motion for relief from judgment, I suspected only a slight exaggeration, such that there might have been an administrative communication about the wire shortly

before October 9. Nothing at the summary judgment stage suggested the degree of coordination, concealment, and misdirection that NAMA proved at trial.

Having heard the evidence, I find that Related Sub did not take action in reliance on a demand letter that it believed to be genuine. Related Sub acted because Brenner and Samson had agreed to their *quid pro quo*. The demand letter was genuine only in the technical sense that it was sent on behalf of Network and signed by Samson and Kashani, but it was not a genuine part of the dispute resolution process and custodial arrangement contemplated by Section 12.18. Nor did Brenner believe it was genuine in that sense. He understood that it was part of the overarching *quid pro quo*, that its purpose was to trigger the release of the Disputed Amounts to NAMA's detriment, and that Samson did not in fact plan to distribute the amounts in a manner that complied with the Arbitral Decision, despite the representation in the demand letter to that effect. In light of Brenner's subjective knowledge, understandings, and beliefs, Related Sub did not in fact believe that the demand letter was genuine and did not act in reliance upon it. Section 12.18(h)(ii) therefore does not protect Related Sub.

### 4. Damages

Under the Arbitral Decision, NAMA was entitled to receive over $13 million in damages and sanctions against Samson and Kashani's entities, to be paid within thirty days, and the language of the Arbitral Decision indicated that it should come from the Disputed Amounts. Otherwise, those entities were and remain judgment proof.

Because of Brenner's *quid pro quo* with Samson, NAMA received only $5,907,647, representing its *pro rata* share of the Disputed Amounts. NAMA was not

able to recover the $5,894,391 that Samson immediately wired out to entities that he and Kashani controlled. NAMA was damaged in the amount of the $5,894,391 that it otherwise should have recovered.

Related Sub contends that NAMA had an obligation to mitigate damages. It is true that in calculating damages in a breach of contract action, "the value of the loss must be reduced by any cost or other loss avoided by the non-breaching party." *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009). "[A] party cannot recover damages for loss that he could have avoided by reasonable efforts." RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b (1981); 24 WILLISTON ON CONTRACTS § 66:7 (4th ed.) ("The rule of avoidable consequences, which is often incorrectly referred to as the 'duty to mitigate,' provides broadly that, following a breach, the innocent party cannot recover those damages that he or she could have avoided by acting reasonably."). "While there is a general duty to mitigate damages if it is feasible to do so, a plaintiff need not take unreasonably speculative steps to meet that duty." *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch. 1992), *aff'd*, 620 A.2d 856 (Del. 1992). "Mitigation is subject to a rule of reasonableness, and whether a loss is mitigable turns on the circumstances." *W. Willow-Bay Court*, 2009 WL 458779, at *8; *accord Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 504 (Del. 1981), *overruled on other grounds, Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

In this case, Related Sub has not offered a credible means by which NAMA could have mitigated its damages. Related Sub says NAMA first must pursue Samson and Kashani and the other Alliance Network members, but when parties are potentially

jointly and severally liable for the same harm, that is *not* required. RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 10 (2000). NAMA has sought to recover damages from other parties through litigation in other forums, but NAMA has yet to achieve any success. NAMA will not be permitted to obtain a duplicative recovery. That principle protects Related Sub, as does its ability to seek contribution or indemnification from Samson and Kashani, either at common law or under the Joint Defense Agreement. A failure to mitigate is not a defense.

## B.      Tortious Interference With The Implied Covenant

NAMA asserts that Related Parent and WMCV tortiously interfered with the covenant of good faith and fair dealing implied in Section 12.18 and the Segregation Order such that they are jointly and severally liable with Related Sub. Delaware follows the RESTATEMENT (SECOND) OF TORTS for purposes of analyzing claims for tortious interference with contract. *WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010). "One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other." RESTATEMENT (SECOND) OF TORTS § 766 (1979). For a plaintiff to recover for tortious interference with contractual relations, "[t]here must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987) (Allen, C.). This decision

55

already has held that there was a contract (the Segregation Order) and a breach of an implied term of that contract (Related Sub's failure to act as a neutral custodian). This decision also has held that NAMA was damaged in the amount of $5,894,391. Elements (1) and (5) are therefore met, as is the breach contemplated by element (3). The issues remaining in dispute are whether Related Parent knew about the contractual obligation, whether Related Parent engaged in an intentional act, and whether Related Parent acted without justification.

"The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance." *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 589 (Del. Ch. 1994) (Allen, C.). The adjective "improper" is critical. For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business. "[C]laims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete." *Agilent Techs. v. Kirkland*, 2009 WL 119865, at *8 (Del. Ch. Jan. 20, 2009) (Strine, V.C.). Determining when intentional interference becomes improper requires a "complex normative judgment relating to justification" based on the facts of the case and "an evaluation of many factors." *Shearin*, 652 A.2d at 589 (internal quotation marks omitted). Section 767 of the RESTATEMENT (SECOND) OF TORTS provides such a list, which the Delaware Supreme Court has adopted. *WaveDivision*, 49 A.3d at 1174. The factors are:

56

(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.* Notably, several of the factors for evaluating justification overlap with other substantive elements of the claim for tortious interference, such as the actor's knowledge of the contract, the actor's intent, and the nature of the harm, resulting in a degree of redundancy in the analysis of a tortious interference claim. *See* RESTATEMENT (SECOND) OF TORTS, ch. 37, Intro. Note ("[T]here is no clearcut distinction between the requirements for a prima facie case and the requirements for a recognized privilege. Initial liability depends upon the interplay of several factors and is not reducible to a single rule; and privileges, too, are not clearly established but depend upon a consideration of much the same factors.").

When the defendant against whom the plaintiff seeks to impose liability for tortious interference with contract controls an entity that was a party to the contract, the weighing of factors becomes more complex.

> Ordinarily, of course, only property belonging to the corporation [that is the party to the contract] is available to satisfy obligations of the corporation. Thus, while there may be independent grounds to hold another liable for the obligations of a corporation . . . [,] those in control of a corporation are not typically liable for distinctly corporate obligations by reason of that control. This "fact," of course, supplies one of the principal utilities of the corporate form of organization.

*Irwin & Leighton*, 532 A.2d at 998 (internal citations omitted). A party who wishes to have a parent corporation backstop the obligations of its subsidiary can do so by contract,

either by making the parent a party to the agreement or by obtaining a parent-level guarantee. Delaware law respects corporate separateness, and under Delaware law a claim of tortious interference with contract cannot be used to supply a party that did not obtain a parent-level contractual commitment with protection that it did not obtain at the bargaining table.

But Delaware's respect for corporate separateness also means that Delaware maintains a role for tortious interference with contract even in the parent-subsidiary context. Delaware law rejects the theory that "a parent and its wholly owned subsidiaries constitute a single economic unit" such that "a parent cannot be liable for interfering with the performance of a wholly owned subsidiary." *Shearin*, 652 A.2d at 590; *accord Allied Capital*, 910 A.2d at 1038. Delaware law instead balances "the significant economic interest of a parent corporation in its subsidiary," including the parent's interest in consulting with its subsidiary, against the subsidiary's status as a separate entity and the interests of third parties in their contractual relationships with the subsidiary. *Shearin*, 652 A.2d at 590. The result is a qualified privilege which protects a parent corporation that "pursues lawful action in the good faith pursuit of [the subsidiary's] profit making activities." *Id.* To establish liability on the part of the parent corporation, the plaintiff must show that the parent corporation "was not pursuing in good faith the legitimate profit seeking activities of its affiliated enterprise" that was a party to contract. *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks and alterations omitted). The non-breaching party can make the necessary showing by proving that the parent "sought not to achieve permissible financial goals but sought

58

maliciously or in bad faith to injure plaintiff." *Id.* (internal quotation marks omitted). In other words, "a parent corporation can be held liable for tortiously interfering with its subsidiaries' contracts when a plaintiff proves that the parent was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises." *Allied Capital*, 910 A.2d at 1039; *accord Shearin*, 652 A.2d at 591.

After considering the factors identified in the RESTATEMENT (SECOND) OF TORTS and taking into account the parent-subsidiary relationship between Related Parent and Related Sub, this opinion holds that Related Parent tortiously interfered with the implied covenant. Related Parent is therefore jointly and severally liable with Related Sub.

### 1. The Defendants' Status As Parties To The Contract

NAMA has sued both WMCV and Related Parent for tortious interference with contract. "Imposition of liability for tortious interference with contractual relationship requires that the defendant be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007) (internal quotation marks omitted). "[A] party to a contract cannot be liable both for breach of [a] contract and for inducing that breach." *Bhole*, 67 A.3d at 453 (second alteration in original; internal quotation marks and citation omitted).

WMCV was a party to the Segregation Order and so cannot be liable for tortious interference. Judgment is entered in favor of WMCV on this count. Related Parent was not a party to the Segregation Order, so it can be liable for tortious interference if the other elements of the tort are met.

59

## 2. Knowledge Of The Contractual Obligation

To show tortious interference with a contractual obligation, the plaintiff must prove that the defendant knew of the underlying contractual obligation. *WaveDivision*, 49 A.3d at 1176. Knowledge of an agent may be imputed to the entity. *Id.* at 1176-77. "Delaware courts consistently have imputed to a corporation the knowledge of an officer or director of the corporation when acting on its behalf." *B.A.S.S. Gp., LLC v. Coastal Supply Co.*, 2009 WL 1743730, at *7 n.72 (Del. Ch. June 19, 2009). "Generally, the fact that two or more corporations have officers or agents in common will not of itself impute the knowledge gained by such officers while acting for one corporation to another corporation in which they also hold office." *Id.* There are, however, exceptions to this general rule "under which the knowledge gained by an officer or agent of one corporation will be carried over and imputed to another corporation." *Id.*

One circumstance in which an officer's knowledge obtained while serving one corporation may be imputed to another corporation is when the officer owes his employment with the former corporation to his role with the latter. *Id.* Brenner fits this paradigm. He served as an officer of both Related Parent and Related Sub, and Related Parent, as the sole member of Related Sub, appointed Brenner to his positions with that entity. Brenner's service as an officer of Related Sub was part of the scope of his employment for Related Parent, and the actions he took on behalf of Related Sub were taken on behalf of Related Parent. Attribution is particularly appropriate for purposes of the *quid pro quo* with Samson over the release of the Disputed Amounts, because only Related Parent, not Related Sub, needed access to the Network Escrow to fund its

60

obligations under the Master Lease Agreement. Related Sub was not a party to the Master Lease Agreement and had no need to access the Network Escrow. Brenner used his authority as an officer of Related Sub to cause Related Sub to release the Disputed Amounts because it would benefit Related Parent. Brenner's knowledge as an officer of Related Sub is therefore appropriately imputed to Related Parent.

Another circumstance where knowledge will be imputed is where an officer's "knowledge is present in the officer's mind and memory at the time the officer engages in a transaction on behalf of such other corporation . . . ." 18B Am. Jur. 2d *Corporations* § 1454. At trial, Brenner testified that on any given day he would act on behalf of both Related Sub and Related Parent. Trial Tr. 267-68 (Brenner Cross). He claimed that he was acting as an officer of Related Parent during his discussions with Samson regarding the Master Lease Escrow and the personal loan to Samson, but he admitted that he could not segregate the information he learned while acting on behalf of Related Sub and that he necessarily used that information when acting for Related Parent. *Id.* at 268. Brenner's knowledge is again appropriately imputed to Related Parent.

Through Brenner, Related Parent knew of Related Sub's implied obligation to act neutrally. Brenner familiarized himself with the relevant agreements and was aware of their import. In an e-mail to Blau, he referred to Related Sub's responsibility to hold the Disputed Amounts as escrow. He knew that Related Sub was not supposed to favor one claimant to the Disputed Amounts over another, much less conspire with one claimant as part of a *quid pro quo*. He similarly knew that by causing Related Sub to release the Disputed Amounts to Samson, Related Parent would cause Related Sub to breach its

61

obligation. Brenner's own description of the *quid pro quo* demonstrated that he understood it was wrongful: "[I]t feels like extortion—but I think it makes sense in facilitating our access to the funds." JX 156.

### 3. Intentional Interference

Tortious interference with contract requires an intentional act that was a significant factor in causing a breach. *See Irwin*, 532 A.2d at 992. "Knowledge of the contract itself is insufficient to establish a tortious interference claim"; the actor also must intend to interfere. *Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*, 2013 WL 3352672, at *5 (Del. Super. June 27, 2013). "The word 'intent' is used throughout the Restatement . . . to denote that the actor . . . believes that the consequences are substantially certain to result from [his act]." RESTATEMENT (SECOND) OF TORTS § 8A. For purposes of tortious interference, the intent requirement is met by "an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." *Id.* § 766 cmt. j; *accord Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009).

This element is easily met. Through Brenner, Related Parent caused Related Sub to release the Disputed Amounts. That was a conscious act. Brenner knew that it violated Related Sub's obligation to act as a neutral custodian, benefited Samson and Kashani, and harmed NAMA. He intended to cause both the benefit and the harm as part of the *quid pro quo*.

### 4. Justification And The Affiliate Privilege

The most difficult aspect of the tortious interference analysis is the question of justification. As discussed, a court applying Delaware law evaluates this element by weighing the seven factors identified in the RESTATEMENT (SECOND) OF TORTS. *WaveDivision*, 49 A.3d at 1174. When a plaintiff contends that a parent entity tortiously interfered with a contract to which its subsidiary was a party, a court applying Delaware law analyzes the seven factors in a manner that takes into account the dynamics of the parent-subsidiary relationship, including the parent's significant economic interest in its subsidiary, the parent's interest in consulting with its subsidiary about the subsidiary's profit-making opportunities, and the legitimate use of subsidiaries for cabining risk.

### a. The Nature Of Related Parent's Conduct

The first factor is the nature of the actor's conduct.

> Some [types of conduct], like fraud and physical violence, are tortious to the person immediately affected by them; others, like persuasion and offers of benefits, are not tortious to him. Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it. The propriety of the means is not, however, determined as a separate issue unrelated to the other factors. On the contrary, the propriety is determined in the light of all the factors present. Thus physical violence, fraudulent misrepresentation and threats of illegal conduct are ordinarily wrongful means and subject their user to liability even though he is free to accomplish the same result by more suitable means.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. c. "A fraudulent misrepresentation is ordinarily an improper means of interference and precludes a defense of justification."

*WaveDivision*, 49 A.3d at 1174; *see also Diver v. Miller*, 148 A. 291, 293 (Del. Super. 1929) (noting that the availability of an action for tortious interference with contract "seems to be conceded by practically all courts where the breach of the contract has been brought about not by mere persuasion but by fraudulent representations, threats, intimidation, defamatory statements, or other unlawful means").

Related Parent did not engage in conduct towards NAMA and its contractual rights that was independently tortious. Through Brenner, Related Parent caused Related Sub to release the Disputed Amounts to Samson. In doing so, Related Parent caused Related Sub to breach its obligation to serve as a neutral custodian, but the means that Related Parent chose to induce the breach were not wrongful. Related Parent directed the conduct of its controlled subsidiary through the medium of an individual who served as an officer of both entities. The use of that channel is permitted and, standing alone, does not support a claim for tortious interference. *Shearin*, 652 A.2d at 591. This factor counsels in favor of finding that Related Parent's actions were justified.

### b. Related Parent's Motive

The second factor is the actor's motive.

> Since interference with contractual relations is an intentional tort, it is required that . . . the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct. Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. A motive

64

to injure another or to vent one's ill will on him serves no socially useful purpose.

The desire to interfere with the other's contractual relations need not, however, be the sole motive. If it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances. On the other hand, if there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. d (citations omitted).

In the parent-subsidiary context, the parent has an interest in the profit-making activities of the subsidiary and a privilege to consult with the subsidiary. *Shearin*, 652 A.2d at 590. This means that when evaluating the second factor, a court must accept that the parent may intend for the subsidiary to breach the contract, and such an intent will not support imposing liability for tortious interference if the breach is consistent with the good faith pursuit of the subsidiary's legitimate profit-making activities, such as through an efficient breach of contract. *Bhole*, 67 A.3d at 453. The principle of efficient breach contemplates that "properly calculated expectation damages increase economic efficiency by giving the other party an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445-46 (Del. 1996) (internal quotation marks omitted). Efficient breach increases societal wealth by enabling parties to exit from inefficient contracts and transfer assets or services to a higher valued use. If the non-breaching party could use tortious

interference with contract to impose greater tort-based liability on a parent corporation than a breach of contract claim would support, the parent corporation would be less inclined to cause its subsidiary to breach efficiently, thereby reducing societal wealth.

Rather than considering whether the parent corporation intended for the subsidiary to breach the contract, the relevant inquiry in the parent-subsidiary context is whether the parent was pursuing in good faith the legitimate profit-seeking activities of the subsidiary that was a party to contract. *Bhole*, 67 A.3d at 453. The non-breaching party can show that the parent corporation was not pursuing the legitimate profit-seeking activities of its subsidiary by proving that the parent intended to injure the plaintiff maliciously or in bad faith. *Id.* Decisions applying Delaware law have held that a parent corporation acted in bad faith where the parent corporation took action that both induced a breach of contract and rendered the subsidiary unable to satisfy its contractual obligations. *See Am. Gen. Hldgs., LLC v. Renco Gp.*, 2013 WL 5863010, at *13 (Del. Ch. Oct. 31, 2013); *WP Devon Assocs. v. Hartstrings, LLC*, 2012 WL 3060513, at *4 (Del. Super. July 26, 2012); *Allied Capital*, 910 A.2d at 1024.

In this case, the evidence established that Related Parent, through Brenner, caused Related Sub to breach its obligation to act as a neutral custodian, knowing that the breach would harm NAMA, and intending for that to happen. Brenner knew that the Arbitral Decision awarded NAMA over $13 million in damages and monetary sanctions, and that The Panel contemplated that the Disputed Amounts would be used to satisfy the award. Brenner also knew that Samson and Kashani would not receive any of the Disputed Amounts if the funds were handled as contemplated by the Arbitral Decision. By

66

coordinating the release to place the Disputed Amounts in Samson's control without prior notice to NAMA, Brenner intended to enable Samson and Kashani to divert approximately $5.9 million into their own pockets, thereby preventing NAMA from receiving these amounts to satisfy the Arbitral Decision.

These effects were critical for the *quid pro quo*. Throughout 2009, Samson had demanded a personal loan from Related Parent as the price of agreeing to give Related Parent access to the Network Escrow. *See* JX 156 ("$1 million transitional loan *in exchange for* $11 million long term funds should be an easy ok; especially since Jeff gave his ok 7 months ago at February market.") (emphasis added). Related Parent would not provide the loan, not because Related Parent recognized that the loan was inappropriate or that it would breach Samson and Kashani's commitment not to receive side benefits under the Alliance Network Operating Agreement, but because Related Parent did not believe Samson and Kashani could provide suitable collateral. The choreographed release of the Disputed Amounts eliminated the need for the loan by substituting NAMA's money for Related Parent's. Without harm to NAMA, the *quid pro quo* would not have worked.

By releasing the Disputed Amounts, Related Parent was not engaged in the good faith pursuit of legitimate profit-making activities of Related Sub, such as if Related Sub had engaged in an efficient breach of contract. Related Parent was pursuing its own interest in accessing the Network Escrow, which Related Sub did not share. Getting money into Samson and Kashani's pockets was the price of access. Related Sub had no comparable economic interest in releasing the Disputed Amounts. Related Sub was not a

party to the Master Lease Agreement, had no interest in the Network Escrow, and had no profit-making reason to risk breaching the Segregation Order. *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *38 (Del. Ch. Sept. 30, 2013) (finding justification lacking where a parent corporation pursued its own economic interests rather than the profit-seeking activities of its affiliates). At the same time, Related Parent's actions ensured that Related Sub would not have any funds that could be used to satisfy its obligations to NAMA under the Arbitral Decision, which decisions have found is consistent with a parent entity's bad faith. *See Am. Gen.*, 2013 WL 5863010, at *13; *WP Devon*, 2012 WL 3060513, at *4; *Allied Capital*, 910 A.2d at 1024.

Related Parent acted in bad faith. This factor weighs strongly against finding that Related Parent's actions were justified.

### c. The Interests Of NAMA And Related Sub

The third factor is the nature of the interests with which the actor's conduct interferes.

> Some contractual interests receive greater protection than others. Thus, depending upon the relative significance of the other factors, the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference would be improper if it involved persuading the third party to commit a breach of an existing contract with the other. The result in the latter case is due in part to the greater definiteness of the other's expectancy and his stronger claim to security for it and in part to the lesser social utility of the actor's conduct. Again, the fact that a contract violates public policy, as, for example, a contract in unreasonable restraint of trade, or that its performance will enable the party complaining of the interference to maintain a condition that shocks the public conscience, may justify an inducement of breach that, in the absence of this fact, would be improper. Even with reference to contracts not subject to these objections, however, it

68

may be found to be not improper to induce breach when the inducement is justified by the other factors stated in this Section.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. e (citations omitted).

As this passage suggests, the analysis of this factor should take into account whether the obligation was an existing contract, whether it was oral or in writing, and the degree of specificity of the obligation. In this case, Related Sub's obligation to act as custodian for the Disputed Amounts was memorialized in three written agreements: Section 11 of the Alliance Network Operating Agreement, Section 12.18 of the WMCV Operating Agreement, and the Segregation Order. In the hierarchy of contractual commitments, an obligation confirmed three times in writing, including once in a court order, would seem entitled to significant protection.

Counterbalancing this assessment is the reality that NAMA has relied on implied obligations. Just as a business expectancy is less worthy of protection than an actual contract, an implied obligation would seem less entitled to protection than an express obligation. This decision, however, has found that the implied obligation to act as a neutral custodian was "so fundamental that [the parties] did not need to negotiate about [it]." *Katz*, 508 A.2d at 880. A fundamental obligation inherent in a court order seems worthy of protection analogous to an express term in written contract.

The nature of NAMA's interests also turns on the substantive terms of the obligation. In this case, the obligation entailed Related Sub acting as a neutral custodian pending resolution of the claimants' disputes. Not only NAMA, but all of the Alliance Network members had an interest in Related Sub's performance. The custodian service

was a cornerstone of the dispute resolution process, because if the prevailing member could not be assured of access to the Disputed Amounts, the process could not function. Although contractual in nature, the custodial obligation was freighted with an expectation of trust. The premise of neutrality was basic and easy for everyone to understand, especially given the history of disputes among the Alliance Network members.

In my view, a straightforward obligation of neutrality like the one Related Sub assumed is worthy of substantial protection. The costs of negotiating dispute resolution mechanisms would multiply if parties were forced to spell out in excruciating detail a list of actions that a neutral custodian could not take while holding the funds. At the time of contracting, the parties to a dispute have little reason to invest significant resources in trying to anticipate such problems because their interests are aligned in wanting a neutral custodian and because the premise of neutrality is so fundamental. In practice, a premise of neutrality is easy to follow. "It is an ancient maxim that equality is equity." *Read v. Tidewater Coal Exch.*, 118 A. 304, 305 (Del. Ch. 1922).

A straightforward obligation of neutrality is also worthy of substantial protection because of the potential for mischief that would result from ineffective enforcement. Once a custodian takes possession of disputed property, it has significant advantages over the disputants and can act opportunistically. The custodian could insist on additional compensation from the prevailing disputant before returning the property, recognizing that because the custodian has possession, the prevailing disputant would face the burden and expense of taking legal action to enforce its rights. Or the custodian could use its position to defeat the dispute resolution outcome by favoring the non-prevailing disputant

in return of side benefits, as Related Sub did in this case. A custodian could act secretly, as Related Sub did here, thereby threatening to defeat enforcement and undercutting the viability of the mechanism.

The obligation to act as a neutral custodian differs from a customer or supplier arrangement where notions of legitimate competition and efficient breach come into play. The obligation to act as a neutral custodian is more functional and foundational, forming part of the infrastructure on which commerce is built. The nature of NAMA's interest in having Related Sub comply with its obligation therefore warrants significant protection, and this factor counsels against finding that Related Parent's actions were justified.

### d.    Related Parent's Interest

The fourth factor is the nature of the interest that the actor sought to promote.

> Usually the actor's interest will be economic, seeking to acquire business for himself. An interest of this type is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means. If the interest of the other has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the actor's own interest in taking that established right from him. Of course, the interest in gratifying one's feeling of ill will toward another carries no weight.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. f (citations omitted).

This decision already has covered much of the ground relevant to this factor. Related Parent sought to pursue an economic interest, but it was not an economic interest shared with Related Sub. Related Parent's actions therefore did not serve an interest in the profit-maximizing activities of Related Sub. To the contrary, Related Parent's actions caused Related Sub to be unable to fulfill a remedial obligation of its own that it

otherwise could have met. In doing so, Related Parent took from NAMA its right to the Disputed Amounts that was established in the Arbitral Decision. Related Parent understood that under the Arbitral Decision, Samson and Kashani would not be entitled to any of the Disputed Amounts and that NAMA would receive all of them. Related Parent nevertheless orchestrated the release of the Disputed Amounts to provide liquidity to Samson and Kashani. Related Parent did so because Samson and Kashani had demanded liquidity as the price for Related Parent's access to the Network Escrow. Related Parent engaged in a *quid pro quo* that Brenner himself regarded as inappropriate and analogized to extortion. Under the circumstances, the nature of the interest that Related Parent sought to promote did not warrant protection, and this factor counsels against finding that Related Parent's actions were justified.

### e. The Societal Interest

The fifth factor is the societal interest in the activities giving rise to the claim. A claim for tortious interference often involves

> situations affecting both the existence and the plan of competitive enterprise. The social interest in this enterprise may frequently require the sacrifice of the claims of the individuals to freedom from interference with their pursuit of gain. Thus it is thought that the social interest in competition would be unduly prejudiced if one were to be prohibited from in any manner persuading a competitor's prospective customers not to deal with him. On the other hand, both social and private interests concur in the determination that persuasion only by suitable means is permissible, that predatory means like violence and fraud are neither necessary nor desirable incidents of competition.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. g (citations omitted).

Here again, this decision already has covered much of the relevant ground. Related Parent's actions in causing Related Sub to release the Disputed Amounts did not further a societal interest in competitive enterprise or efficient breach of contract. Related Parent caused Related Sub to breach an implied obligation of neutrality that was a cornerstone of a dispute resolution mechanism. Related Sub's custodial obligation carried an expectation of trust, and the premise of neutrality was basic, inherent, and straightforward. Society has an interest in ensuring that fundamental obligations of this type are enforced to ensure that dispute resolution mechanisms function efficiently and to minimize the expense of contracting. The societal interest factor counsels against finding that Related Parent's actions were justified.

### f. The Proximity Of Related Parent's Conduct To The Interference

The sixth factor is the proximity of the actor's conduct to the interference giving rise to the claim.

> One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, and mere knowledge that this consequence is substantially certain to result may be sufficient.
>
> If, however, A induces B to sell certain goods to him and thereby causes him not to perform his contract to supply the goods to C, this may also have the effect of preventing C from performing his contractual obligations to supply them to D and E. C's failure to perform his contracts is a much more indirect and remote consequence of A's conduct than B's breach of his contract with C, even assuming that A was aware of all of the contractual obligations and the interference can be called intentional. This remoteness conduces toward a finding that the interference was not improper. The

weight of this factor, however, may be controverted by the factor of motive if it was the actor's primary purpose to interfere with C's obligation to D and E, or perhaps by the factor of the actor's conduct if that conduct was inherently unlawful or independently tortious. Similar results follow in cases in which the person whose contract was the subject of the initial interference has contracts of his own with his employees, his subcontractors or his suppliers, which he is now unable to perform.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. h.

The application of this factor is straightforward. Related Parent caused Related Sub to breach its obligation of neutrality. Related Parent's involvement was as proximate and direct as it could be. This factor weights against a finding that Related Parent's interference was justified.

### g. The Relations Between The Parties

The seventh and last factor is an assessment of the relations between the parties.

The relation between the parties is often an important factor in determining whether an interference is proper or improper. In a case where A is the actor, B is the injured party and C is the third party influenced by A's conduct, the significant relationship may be between any two of the three parties. Thus A and B may be competitors, and A's conduct in inducing C not to deal with B may be proper, though it would have been improper if he had not been a competitor. Or, if A is C's business advisor, it is proper for him to advise C, in good faith and within the scope of C's request for advice, that it would be to his financial advantage to break his contract with B, while it would be improper if he were a volunteer. Again, it is important whether the relationship between B and C is that of a prospective contract, an existing contract or a contract terminable at will.

RESTATEMENT (SECOND) OF TORTS § 767 cmt. i (citations omitted). This final factor calls for the court to consider explicitly the implications of the parent-subsidiary relationship.

Because the parent-subsidiary relationship permeates the tortious interference claim, this decision has attempted to consider its implications throughout its analysis. In

sum, Delaware's approach to tortious interference with contract in the parent-subsidiary context manifests a balancing of multiple policies. One of those policies is Delaware's respect for corporate separateness, which recognizes that because a subsidiary is a separate entity, a parent and its subsidiary are not regarded as a single economic unit, and a parent corporation can interfere tortiously with its subsidiary's contractual relationships. *Allied Capital*, 910 A.2d at 1038; *Shearin*, 652 A.2d at 590. Another and equally important policy is Delaware's emphasis on the primacy of contract over tort. "The right of competent persons to make contracts and thus privately to acquire rights and obligations is a basic part of our general liberty. This ability to enter and enforce contracts is universally thought not only to reflect and promote liberty, but as well to promote the production of wealth." *Ryan v. Weiner*, 610 A.2d 1377, 1380 (Del. Ch. 1992) (Allen, C.). "Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce." *ev3, Inc. v. Lesh*, ___ A.3d ___, 2014 WL 4914905, at *2 n.3 (Del. Sept. 30, 2014) (Strine, C.J.).

> Delaware is . . . sensitive to the need for commerce to proceed in a rational and certain way. We . . . respect the ability of sophisticated businesses . . . to make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability.

*ABRY P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006).

One way contracting parties limit their liability is by using subsidiaries. "A huge amount of wealth generation results from the use of distinct entities by corporate parents to conduct business. This allows parents to engage in risky endeavors precisely because the parents can cabin the amount of risk they are undertaking by using distinct entities to

carry out certain activities." *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009) (Strine, V.C.). To the extent a counterparty is uncomfortable with a subsidiary-level contract, that party can insist on a parent entity or another affiliated corporation becoming a party to the agreement or providing a contractual guarantee. Too-ready resort to a cause of action for tortious interference against an affiliated entity threatens to upset the contractual bargaining process. A party that has contracted with a subsidiary should not later be able to assert a claim for tortious interference to secure rights it did not bargain for. Nor should a defendant that entered into a transaction based on a set of contractual rights and obligations be exposed unnecessarily to the potentially different liabilities of tort law.

> When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations.

*Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) (Strine, V.C.) (footnote omitted), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006). By limiting the situations in which a claim for tortious interference is available, Delaware promotes the primacy of contract. *Allied Capital*, 910 A.2d at 1038-39.

A third and related policy is the practical recognition that although a parent and a controlled or wholly owned subsidiary are separate entities, the parent has a substantial economic interest in the profit-making activities of its subsidiary. As a result, a parent

and subsidiary can be expected to consult on matters affecting the subsidiary and to make decisions on behalf of the subsidiary or implement them through shared officers or employees.

> If one is privileged by reason of a recognized relationship to discuss the financial welfare of an affiliated party, one may in good faith suggest that a termination of a contract, and the assumption of any resulting liability, would be beneficial to that party. Thus, . . . where corporations affiliated through joint ownership confer with respect to a contract to which one of them is party and a breach of that contract follows, there can be no non-contractual liability to the affiliated corporation, which is privileged to consult and counsel with its affiliates, unless the plaintiff pleads and proves that the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff.

*Shearin*, 652 A.2d at 591.

In this case, all of the parties who invested in the Center used special purpose entities. Related Parent used Related Sub. The Alliance Brothers used NAMA. Samson and Kashani used Prime, and Kashani's relatives used Crescent. The parties doubtlessly created and deployed these entities to limit their risk. NAMA could have asked Related Parent to guarantee Related Sub's performance under Section 12.18 or to become a party to the WMCV Operating Agreement for purposes of that section. The absence of such an agreement suggests that all sides expected to limit their recourse in the ordinary course of business to the entities that were the parties to the agreements.

After taking into account this fact and the relevant policy interests, this decision concludes that Related Parent's actions fell sufficiently outside the ordinary course of business such that Related Parent's interference was not justified by its parent-subsidiary relationship with Related Sub. This is not a case where Related Parent consulted with

Related Sub and then caused Related Sub to pursue a profit-maximizing strategy of efficient breach. Related Sub had no commercial reason to favor Samson and Kashani when releasing the Disputed Amounts. The communications between Brenner and Blau regarding Related Parent's ability to control the release of the Disputed Amounts went beyond the routine consultation or coordination between a parent and subsidiary, supporting instead a finding that Related Parent acted intentionally to harm NAMA's contractual interests. Brenner recognized that Related Sub had no interest in the Network Escrow and no obligation under the Master Lease Agreement. Related Parent knew, through Brenner, that Samson and Kashani desperately needed liquidity, were unlikely to receive any of the Disputed Amounts in light of the Arbitral Decision, but were planning on distributing several million dollars to themselves. Related Parent nevertheless caused Related Sub to breach its custodial obligation.

When the Alliance Network members contracted with Related Sub to act as a neutral custodian under Section 12.18, and when that expectation was confirmed in the Segregation Order, they had a legitimate expectation that Related Parent would respect Related Sub's corporate separateness and would not interfere with Related Sub's contractual obligations. By causing Related Sub to release the Disputed Amounts to Samson, Related Parent ensured that NAMA would not be able to satisfy the damages award it received in the Arbitral Decision, while at the same time Related Parent would secure access to the Network Escrow as part of a *quid pro quo*. As Brenner recognized, this exchange was inappropriate, and Samson and Kashani's demand for cash as the price of accessing the Network Escrow resembled extortion. Yet Related Parent went forward.

In my view, the parent-subsidiary relationship does not insulate a parent entity from liability for such extreme conduct.

## III. CONCLUSION

Related Sub breached an implied term of the custodial agreement that required Related Sub to act neutrally with respect to the Disputed Amounts. Related Sub breached its implied obligation by holding the Disputed Amounts beyond the date when they could have been released, then arranging to release them into Samson's control, knowing that Samson and Kashani would thereby pocket monies that they otherwise would not receive. By intentionally causing Related Sub to take these steps as part of a *quid pro quo* that benefitted Related Parent but not Related Sub, Related Parent became liable for tortious interference with contract. Related Parent and Related Sub are jointly and severally liable to NAMA in the amount of $5,894,391, plus pre- and post-judgment from October 9, 2009, until the date of payment.